Argued March 5, reversed and remanded May 23, 1962

# KAUFMAN *v.* FISHER

371 P. 2d 948

*John C. Anicker, Jr.,* Oregon City, argued the cause for appellant. On the briefs were Jack, Goodwin & Anicker.

*Walter J. Cosgrave,* Portland, argued the cause for respondent. With him on the brief were Winfrid K. Liepe and Maguire, Shields, Morrison, Bailey & Kester, Portland.

Before McAllister, Chief Justice, and Warner, Sloan and O'Connell, Justices.

O'CONNELL, J.

This action is brought against the administratrix of the estate of John Fisher, deceased, to recover damages for injuries suffered by plaintiff while riding in an automobile owned and operated by the decedent, whom we shall refer to as Fisher. At the close of plaintiff's case defendant moved for an order of involuntary nonsuit which was allowed and from which plaintiff appeals.

The questions presented upon appeal are, (1) whether there was sufficient evidence to establish that plaintiff was a paying passenger and thus not within the guest statute, ORS 30.110, and (2), assuming that ORS 30.110 is not applicable, was there sufficient evidence of negligence on the part of the defendant to warrant submitting the case to the jury. Plaintiff relies upon the doctrine of res ipsa loquitur to make out a prima facie case. Under ORS 30.080 it was necessary for plaintiff to establish a prima facie case by evidence exclusive of his own testimony.[1]

_____

[1] Schnell v. Mullen, 222 Or 454, 353 P2d 567 (1960); DeWitt v. Rissman, 218 Or 549, 346 P2d 104 (1959).

ORS 30.080 reads as follows:

"Causes of action arising out of injury to or death of a person, caused by the wrongful act or negligence of another, shall not abate upon the death of the wrongdoer, and the injured person or the personal representatives of one meeting death, as above stated, shall have a cause of action against

The facts were as follows. On October 27, 1959, Fisher asked plaintiff to join Fisher and several other men on a hunting trip to the Blue Mountains near Meacham, Oregon. The members of the party were to share the expenses. Plaintiff declined because he felt that he could not afford it. Fisher proposed that plaintiff take care of the horses to help pay for the expenses of the trip. Plaintiff then accepted the proposal. On October 29th, plaintiff, Fisher and the others started on the trip. Plaintiff rode with Fisher in the latter's jeep. They were towing a horse trailer which was loaded with two horses. Near Meacham, Oregon, they turned off the main highway and proceeded along a mountain road. Fisher was driving. Fisher was killed and plaintiff was injured when the jeep and trailer veered off the road and fell approximately 300 feet down the embankment on the right hand side of the road. The evidence does not explain the specific cause of the accident. When Fisher and plaintiff did not appear at the campsite, the other members of the hunting party, who had preceded them, returned to investigate. They found their injured companions and carried them up to the road where they were taken in a pick-up truck to an ambulance which could not be brought to the scene of the accident because of the condition of the road.

According to the testimony of Kenagy, one of the members of the hunting party who returned to look for Fisher and plaintiff, the road was "just a one

the personal representatives of the wrongdoer; however, the injured person shall not recover judgment except upon some competent satisfactory evidence other than the testimony of the injured person, and the damages recoverable under this section shall not exceed $25,000, which may include a recovery for all reasonable expenses paid or incurred for funeral, burial, doctor, hospital or nursing services for the deceased."

track road," "about a twelve foot road and the gravel and dirt." In describing the bank he stated, "It was pretty steep going up on one side and it is just as steep down the other." There was snow on the ground but, "not right in the tracks," and "it was muddy right at the time there." When asked to describe the marks left by the vehicle Kenagy testified: Well, you could definitely see the tracks there, it went to the left first, which is the upside of the road, just about as far as they could and still be on the shoulder, and then they turned and went down over the hill." The testimony continued as follows:

"Q Trace the marks as you saw them. You saw them on the left-hand side as you said, which is the uphill side of the road?

"A I will say I seen the tracks go up there and I seen the tracks go down.

"Q From the left side of the road where did the tracks then go to?

"A They crossed the road and off to the right.

"Q And could you identify the tracks as you followed them from the left-hand side of the road over to the right-hand side, with reference to say the trailer tracks, if you could tell them?

"A Yes, there was a different tread on them.

"Q Were the tracks that you saw plain and straight in the angle they were going or were they skidded or what were they?

"A No, they were straight.

"Q Now, did you go down this mountain and locate—

"MR. COSGRAVE: Just a moment. I will ask that that be stricken as to whether it skidded or not, your Honor. I think again the witness should describe what he saw.

"MR. JACK: He answered that they were straight.

"THE COURT: He has answered. I think your objection is a little late."

Kyllo, also a member of the hunting party, described the course of the vehicle by reference to the tracks as follows: "Well, it made a right-hand turn there, and the rig went kind of high on the inside of the turn and then it went straight across the road right into the canyon."

We shall now consider the evidence relating to plaintiff's status as paying passenger or guest. The proposal that plaintiff join the hunting party was made at Fisher's farm on October 27. Plaintiff's father, who was present, testified as follows:

"A  *  *  *  They were shoeing the horses that afternoon see, and there was Donald [plaintiff] and John [Fisher] and I out there sitting on the back of the pick-up truck—we were sitting there. That is all I recall that was there, outside of the man that was shoeing the horses.

"Q  What was said about the hunting trip?

"A  They were debating whether Donald was going to go or not at the time. He didn't think he could afford to go.

"Q  You have to tell what was said, more than your conclusion, if you can, not quote it, but just the substance of it.

"A  Well, he asked him to go along, and he said he couldn't hardly afford it. Well then they talked like they usually do and this and that and they got together and John asked him to go along and take care of the horses; if he couldn't see no other way he could get by that

way. He didn't know whether to go or not. He wanted me to go. I said I couldn't go on account of my legs. Outside of that there wasn't very much said.

\* \* \* \* \*

"Q Before Mr. Fisher said take care of the horses, what was said about what sort of a trip and the expenses of it, etc., who was paying the expenses, or how were they doing it, if anything was said about it?

"A There wasn't too much said about that, as I recall. He just said, 'You go along and take care of the horses and that would be part of your share of it.' That is the way I got it."

Kenagy was also present and he testified as follows:

"Q And what were the arrangements about the hunting trip—how about expenses—what was said by Mr. Fisher—you can only tell it if Mr. Fisher was present when it was discussed. Do you remember anything that was said about the expenses?

"A Well, we were going to pay our own way, I guess.

"Q Was it, as far as you knew, share the expenses all the way around?

"A Yes.

"MR. COSGRAVE: I will object to that last question. The witness has already answered.

"THE COURT: I will sustain the objection.

"MR. JACK: I think he answered. I am sorry."

■■ It would not be unreasonable for the jury to conclude from this testimony, together with the subsequent conduct of the parties, that plaintiff and Fisher had reached an agreement under which plaintiff was to contribute his share of the expenses for the hunting

trip by taking care of the horses.[2]  Under the test we adopted in *Johnson v. Kolovos,* 224 Or 266, 273, 355 P2d 1115 (1960), "Any bona fide prearrangement for sharing expense will take the occupant out of the guest category." It could be found that such a prearrangement was made in the present case.

■  We next consider whether there was sufficient evidence of negligence to permit the submission of the case to the jury. In order to get to the jury on an issue of negligence plaintiff must produce sufficient evidence from which the jury can reasonably conclude "that it is more likely that there was negligence than that there was not." Prosser, Torts (2d ed 1955) § 42, p. 200.[3]  This principle of preponderating probabilities is applicable where the proof of negligence rests entirely upon circumstantial evidence, as it frequently does.

Ordinarily in negligence cases the complaint alleges specific negligent conduct, such as the failure to keep a lookout or to maintain control of the vehicle, and usually there is some evidence to support these allegaations. In many cases the conclusion that the defendant was negligent can be reached only upon the basis of circumstantial evidence. Thus, ordinarily the proof of defendant's failure to maintain control of the vehicle

---

[2] Plaintiff's testimony as to the agreement was as follows: "The first day we talked about it I didn't figure I would go. I couldn't afford to, to begin with, so Mr. Fisher then—it was the day before we left—he said to come along and take care of the horses which he asked me to do, it would help take care of the expenses of the trip, that way. So I told them I guess I would go."

[3] Secanti v. Jones, et al, 223 Or 598, 349 P2d 274, 355 P2d 601 (1960); Eitel v. Times, Inc., 221 Or 585, 352 P2d 485 (1960). Cf., Ehler et ux v. Portland Gas & Coke Co., 223 Or 28, 352 P2d 1102, 353 P2d 864 (1960). See, 2 Harper & James, Law of Torts, § 19.4, pp. 1068-1069 (1956); James, Jury Control Devices, 47 Va L Rev 218 (1961).

or to keep a proper lookout does not rest upon testimonial evidence but upon an inference that because the accident occurred in a certain way the defendant failed to exercise care in the specific manner alleged.

■ Where the plaintiff cannot point to specific circumstances to support an inference of specific negligent conduct (e.g., lack of control, failure to keep a lookout) he ordinarily does not make out a prima facie case. But this is not always true. In some situations, although no specific conduct of the defendant can be pointed to as evidence of his negligence, it is reasonable to infer that the accident would not have happened had the defendant not been negligent. This is the doctrine of res ipsa loquitur.[④] The doctrine "permits the drawing of an inference which rests upon no specific causative circumstance" as we put it in *Powell v. Moore,* 73 Or Adv Sh 149, 228 Or 255, 364 P2d 1094, 1101 (1961).

■ The doctrine differs only in degree from the

---

[④] The doctrine has been explained in our previous cases. See Powell v. Moore, 73 Adv Sh 149, 364 P2d 1094 (1961) and cases cited therein. The necessary elements of the doctrine are stated in Prosser on Torts (2d ed 1955) p. 199, as follows:

"* * * One type of circumstantial evidence, to which the courts have given the name res ipsa loquitur, arises where

"a. The accident is of a kind which ordinarily does not occur in the absence of someone's negligence, and

"b. The apparent cause of the accident is such that the defendant would be responsible for any negligence connected with it, and

"c. The possibility of contributing conduct which would make the plaintiff responsible is eliminated."

The statement of the first requirement in the manner in which it is expressed above has been criticized on the ground that the word "ordinarily" as used "is misleading, since it directs attention at the total range of experience in a given field, whereas the inquiry should be turned toward the extraordinary or abnormal occasions *when accidents occur,* and the question whether their occurrence is more often attributable to negligent conduct or not." Fricke, The Use of Expert Evidence in Res Ipsa Loquitur Cases, 5 Villanova L Rev 59, 60 (1959). See also, Morris, Res Ipsa Loquitur in Texas, 26 Tex L Rev 257 (1948).

familiar principle recognizing circumstantial evidence as a basis for proof of *specific* acts of negligence.[9] If the accident is of a kind which ordinarily would not have occurred in the absence of defendant's negligence, an inference is permissible that defendant was negligent in some particular, even though it is impossible to determine in what specific way defendant was negligent. Thus it is seen that when the doctrine is applicable the jury is permitted to speculate in the sense that it may say: "We believe that defendant must have been negligent since accidents of this kind do not ordinarily occur in the absence of negligence, but we can not point to any specific conduct, such as the failure to keep a lookout, as a basis for our inference."

We re-emphasize the fact that the process of inference drawing just described is the same as that used by a jury in concluding that a defendant was negligent in some specific way, such as in failing to keep a proper lookout. Where failure to keep a lookout is specifically alleged ordinarily there is no direct evi-

---

[9] "In civil cases the plaintiff has the burden of proving his case by a bare preponderance of the evidence. This means that he must satisfy the triers of fact that fifty-one per cent of the probabilities are in his favor. In negligence cases he is required only to convince the jury that it is more likely that his injuries were caused by negligence than that they were not. He must do so by evidence, and not by mere speculation and conjecture; [citing cases] and where the probabilities are at best evenly balanced between negligence and its absence, [citing cases] it becomes the duty of the court to direct the jury that there is no sufficient proof. A case of res ipsa loquitur is no exception to these familiar rules. It is the plaintiff's task to make out a case from which, on the basis of experience, the jury may draw the conclusion that negligence is the most likely explanation of the accident. That conclusion is not for the court to draw, or to refuse to draw so long as there is enough to permit the jury to draw it; and even though the court would not itself infer negligence, it must still leave the question to the jury where reasonable men may differ as to the balance of probabilities." Prosser, Selected Topics on the Law of Torts, pp. 319-320 (1954).

dence that a defendant failed to keep a lookout; the jury reasons that, because an accident of the kind in question ordinarily does not happen in the absence of a failure to keep a lookout, it is reasonable to infer that the defendant negligently failed to keep a lookout in the case before it. Under res ipsa the inference simply has a broader sweep, it being inferred that because accidents of the kind in question do not ordinarily occur in the absence of negligence, the defendant must have been negligent in some specific manner although the specific negligent conduct may not be identified since there is no proof to establish it.[6]

■ Whether the inference of negligence is drawn from specific conduct or simply from the fact that the accident happened, the test of preponderating probabilities is the same; in either case plaintiff can get to the jury if there is a rational basis for concluding that it was more probable than not that the defendant's failure to exercise reasonable care was the cause of the accident.[7]

It is sometimes intimated that the doctrine of res ipsa loquitur does not apply unless there is something *more* than a preponderating probability of defendant's negligence, i.e., that the accident must not only "speak" of defendant's negligence—it must "scream"

[6] "What is a *res ipsa loquitur* case anyhow? Reduced to simple terms does it not merely mean that negligence can be proved by circumstantial evidence and that certain circumstances, as to the character of an accident, are sufficient to take the case to the jury?" Harke v. Haase, 335 Mo 1104, 1110, 75 SW2d 1001, 1003 (1934). See, Prosser, Selected Topics in the Law of Torts, 311-314 (1953); Prosser, Res Ipsa Loquitur in California, 37 Calif L Rev 183 (1949); 39 N C L Rev 198 at 202 (1961).

[7] The logic of proof in this connection is clearly stated in Morris, Res Ipsa Loquitur in Texas, 26 Tex L Rev 257, 260 (1948):
"The requirement that the accident be one which ordinarily does not occur in the absence of someone's negligence is solely

that such is the case.® But, as it has been pointed out, "Res ipsa loquitur is applied not only where the inference is compelling but far more often where it is relatively weak and barely permissible." Prosser, Selected Topics on the Law of Torts, p. 360 (1953).® We have

a matter of the logic of proof. Proof of the occurrence of a type of injury which is as easily attributable to unavoidable accident as it is to negligence does not tend to establish negligence of the defendant by a preponderance of the evidence. In such a case a conclusion of negligence would be mere conjecture, unless supported by other evidence. But if an accident is of a type which is attributable to the absence of proper care more often than not, the occurrence of such an accident implies a preponderant probability that it was caused by negligence. The strength of the probability, of course, is relative, but proof in a negligence case is always relative, a matter of preponderant probability. The plaintiff is not required to exclude all other possible explanations of the occurrence."

® Kunzie v. Leeds, Inc., 66 Ohio App 469, 34 NE2d 448 (1941), "unusual happening of a violent nature"—elevator dropped suddenly and stopped between floors. See, Prosser, Selected Topics on the Law of Torts, p. 316 (1953); Malone, Res Ipsa Loquitur and Proof by Inference—A Discussion of the Louisiana Cases, 4 La L Rev 70 at 79 (1941).

For example, the inference of negligence is almost undeniable where a 30,000-gallon water tank located on the roof of defendant's building collapses, Suko v. Northwestern Ice Co., 166 Or 557, 113 P2d 209 (1941); or where a safety chain on an amusement park ride releases throwing the rider to the ground, Eldred v. United Amusement Co., 137 Or 452, 2 P2d 1114 (1931); or where a 300-lb. marble slab tips over in a burial vault, Gillilan v. Portland Crematorium Assn., 120 Or 286, 249 P 627 (1927). But the inference is weaker where a patron slips and falls on the floor of a restaurant, Delacroix v. Sanders, 219 Or 494, 347 P2d 966 (1959); or where a prospective rider steps in a hole near the ticket window for an amusement park ride, Shaw v. Hayden Island Amuse. Co., 178 Or 210, 166 P2d 128 (1946); or where there is a collision between an automobile and a railroad train at a grade crossing, Fish v. Southern Pacific Co., 173 Or 294, 143 P2d 917, rehearing denied, 173 Or 294, 145 P2d 991 (1944).

® "The clearer the probabilities, the less the need for resort to any special doctrine. But the doctrine is probably more often invoked in practice in run of the mill occurrences where the facts of the occurrence before the courts are meager. * * * It is here

previously recognized this principle. Thus in *Powell v. Moore,* 73 Or Adv Sh 149, 228 Or 255, 364 P2d 1094, 1099 (1961), we said: "We regard the evidence as sufficient to show * * * the probability that defendant's conduct was the cause of the fall [of a ramp] is greater than the probability that the fall resulted from the negligence of another, including plaintiff." To make the doctrine of res ipsa loquitur available to the plaintiff it is not necessary that he eliminate other probable causes.[⑩]

---

the doctrine is most sorely needed and it is here that the postulates as to probabilities are most often doubtful since most machines and appliances simply are not foolproof, even when made and kept and used with reasonable care." 2 Harper & James, Torts § 19.6, p. 1082 (1956). The Oregon court, recognizing this fact, has applied res ipsa loquitur where a tire blew out on a bus, Simpson v. The Gray Line Co., 226 Or 71, 358 P2d 516 (1961); where a hand truck tipped over, dropping a load of paper on a longshoreman, Carlson v. Wheeler-Hallock Co., 171 Or 349, 137 P2d 1001 (1943); where gas escaped from a gas main, Sharkey v. Portland Gas Co., 74 Or 327, 144 P 1152, 145 P 660 (1915); and where a water main burst, Esberg Cigar Co. v. Portland, 34 Or 282, 55 P 961, 43 LRA 445 (1899).

[⑩] Foltis, Inc. v. City of New York, 287 NY 108, 115, 38 NE2d 455 (1941), where the court said, quoting from Galbraith v. Busch, 267 NY 230, 196 NE 36 (1935), " 'To negative every possibility that the accident occurred in some extraordinary manner which would exculpate the defendant is often impossible.' " Cf., Burlington-Rock Island R. R. Co. v. Ellison, 140 Tex 353, 167 SW2d 723 (1943); Prosser, Selected Topics on the Law of Torts, p. 321 (1953) ("the inference is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it.") See, 34 Neb L Rev 102 (1955). But cf., Dunning v. Northwestern Electric Co., 186 Or 379, 199 P2d 648 (1948), 206 P2d 1177 (1949).

However, if he does introduce evidence to eliminate other causes, it will strengthen the inference that defendant's negligence caused the accident. Gordon v. Aztec Brewing, 33 Cal2d 514, 203 P2d 522 (1949); Honea v. Coca Cola Bottling Co., 143 Tex 272, 183 SW2d 968 (1944) (suits against bottling companies by ultimate purchasers where this is usually done). Cf., Fallo v. New York, N.H. & H.R. Co., 123 Conn 81, 192 A 712 (1937); Lane v. Dorney, 250 NC 15, 108 SE2d 55 (1959), 113 SE2d 33 (1960), noted in 39 N C L Rev 198 (1961).

We come then to the question of whether the doctrine of res ipsa loquitur applies to the present case. Could it have been reasonably found by the jury that the accident which occurred in this case is of a kind which more probable than not would not have occurred in the absence of negligence upon the part of Fisher? That is a question which cannot be answered with any precision because we do not have statistical data on the relative probability of the negligence of drivers as a cause of this kind of accident.[⊕] The determination of where the probabilities lie must, ordinarily, be made upon the basis of past experience as it is seen and appraised by the court. "These are the judgments of 'common sense.'" 2 Harper & James, Torts § 15.2, p. 879 (1956).

The process of judgment involves an examination of the inventory of possible causes for an accident of the kind in question. Initially this inquiry is made by the trial judge in determining whether the case should be submitted to the jury. Upon the basis of his understanding of how accidents of the kind in question hap-

---

In the appropriate case plaintiff may strengthen the inference through the use of expert testimony showing that accidents of the kind in question do not commonly happen in the absence of negligence by persons in the defendant's position. Buffums' v. City of Long Beach, 111 Cal App 327, 295 P 540 (1931) (expert testimony that water mains do not normally break in the absence of negligence); McCray v. G.H. & S.A. Ry. Co., 89 Tex 168, 34 SW 95 (1896) (expert testimony that rails would not fall off a flatcar in the absence of negligence). See, Fricke, The Use of Expert Evidence in Res Ipsa Loquitur Cases, 5 Villanova L Rev 59 (1959).

⊕ 2 Harper & James, Torts § 15.2, p. 878 and § 19.14, pp. 1069, 1070 (1956). One study indicates that only 3.5% of cars involved in accidents have been shown to have mechanical defects and that for only 0.25% of the cars involved in accidents can it be shown that the defect played a part in the accident. James and Dickinson, Accident Proneness and Accident Law, 63 Harv L Rev 769, 771 (1950).

pen he decides where the probabilities lie. If he decides that the probabilities of non-negligent causes are as great or greater than the probability of a negligent cause attributable to the defendant he withdraws the case from the jury. On the other hand, if, from the same source of knowledge, he concludes that accidents of the kind in question more often than not occur because of someone's negligence (or if he is of the opinion that expert testimony probably would demonstrate this proposition), he submits the case to the jury. The conclusion thus reached by the trial judge is tentative only because the jury may conclude otherwise. Therefore, although we frequently speak in terms of our own examination of the probabilities (e.g., *Secanti v. Jones,* 223 Or 598, 606, 349 P2d 274, 277 (1960); *Eitel v. Times,* 221 Or 585, 593, 352 P2d 485 (1960)) we are simply saying that because we are of the opinion that the probability of the defendant's negligence is greater than the probability of other causes the jury is entitled to reach the same conclusion, although it is not required to do so.

The foregoing process must be applied to the case at bar. If an automobile leaves a road and there is nothing to explain why it did, we turn to our own knowledge and experience as to the various causes of automobiles leaving roads. The cause may have been the presence of an animal in the roadway, the presence of a bee in the car, a rock in the roadway, the sudden illness of the driver, the blinding effect of the sun, the inattention of the driver, a defect in the mechanism of the automobile, an unforeseeable slippery area in the roadway, or any one of many other possible causes. Some of the possible causes are not attributable to defendant's negligence and some of them are. The law assumes that the court initially and the jury ultimately

can weigh these two classes of possible causes and choose the class which is the more probable under the particular circumstances. The adjudicated cases are not uniform in making this choice. The cases are collected in a recent annotation: Applicability of res ipsa loquitur where motor vehicle leaves road. 79 ALR2d 6 (1961). The annotator concludes that "where a motor vehicle leaves the roadway without a prior collision and thereby causes injury or damage the courts, as a general rule, are prepared to draw an inference of negligence from the occurrence, assuming, of course, that all the other conditions of applicability [of the doctrine of res ipsa loquitur] are met." Id. at 18. A contrary view is taken by some courts. The conflict in authority rests in part upon the difference in understanding of the doctrine of res ipsa loquitur and in part upon the difference in the appraisal of the probabilities attending accidents of this type.

An examination of these cases would be of little value to us in reaching a conclusion in the present case. We believe that where an automobile leaves a highway or roadway and there is no evidence explaining the cause of the accident, the doctrine of res ipsa loquitur applies. In our opinion, accidents of this type more frequently occur as a result of negligence of the driver rather than as a result of some other cause. We cannot prove it; it is simply our understanding of what ordinarily happens in the operation of motor vehicles. As we have explained, this is a tentative conclusion which warrants the submission of the case to the jury for its final decision as to where the probabilities lie.

Defendant argues that the condition of the road in this case provides a basis for forcing the inference that the alleged negligent conduct of the defendant was not the more probable cause. It is pointed out

that there was snow on the road and that it was muddy and rough. Under these circumstances, it is said, the tracks veering first to the left and then to the right, may have been caused "by any of the common vicissitudes of muddy mountain roads," including the possibility that the jeep may have been thrown off its course by skidding in the mud, or by the lurching or skidding of the trailer in the mud, or by the movement of the trailer toward the canyon rim because of the muddy road, requiring the driver to pull the jeep to the left, or that the jeep may have been deflected by a mud-filled hole or rut. But, the muddy and slippery condition of the road provides as many possibilities for negligent conduct as it does for other causes. Moreover, the meager evidence relating to the probable movement of the vehicles would suggest that they did not slide, there being testimony that the tracks were "straight."

There was sufficient evidence to support the application of the doctrine of res ipsa loquitur and to warrant a finding that plaintiff was not a guest within the meaning of ORS 30.080.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.