Argued February 11, affirmed March 17, 1977

SOMMERS, *Appellant,*
*v.*
SISTERS OF CHARITY OF PROVIDENCE
IN OREGON, *Respondent.*
(No. 35-322, SC 24545)

561 P2d 603

William B. Murray, Portland, argued the cause and filed a brief for appellant.

Bruce Spaulding, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, argued the cause and filed a brief for respondent.

Before Denecke, Chief Justice, and Howell, Linde and Bradshaw, Justices.

HOWELL, J.

**HOWELL, J.**

This is an action for personal injuries allegedly suffered by plaintiff while a patient in defendant hospital. The trial court entered a judgment after a directed verdict for defendant, and plaintiff appeals.

Plaintiff, after being severely injured in an accident, received emergency treatment at defendant hospital in April, 1973. As part of the treatment, a large needle, called an "in-dwelling catheter," was inserted into her lower right arm so that she could receive blood transfusions and intravenous medication and feeding. About three days later plaintiff developed a fever. A culture was made at the site of the insertion, and it was determined that plaintiff had a staph infection. The infection continued for about eight days.

Plaintiff's complaint alleged that: "The defendant treated plaintiff negligently and without due care. The defendant used non-sterile and insanitary implements, equipment and facilities which caused the plaintiff to incur infection, commonly known as staph infection."

Plaintiff states in her brief that there is no dispute that the needle was not sterile when it entered plaintiff's bloodstream and that there was medical testimony that the insertion of the intravenous catheter caused the infection. Plaintiff's statement is correct, but it is somewhat misleading. Defendant's counsel did concede at the trial that the staph infection was the result of the insertion of the I.V. Moreover, at least two physicians testified that plaintiff's infection was caused by the entry of the needle into the bloodstream. However, neither they nor anyone else testified that the needle itself was the source of the infection. The record indicates that the hospital used only disposable needles and that the needles were individually sealed in sterile packaging until immediately prior to their use. There was, therefore, absolutely no evidence that the needle was contaminated prior to its insertion into plaintiff's arm, although this was apparently plain-

tiff's theory in alleging that defendant's use of "non-sterile and insanitary implements" caused the infection.

According to undisputed testimony, staph bacteria are not only on the surface of the skin but also under the surface where they cannot always be killed by antiseptics. Dr. Frisch described the problem as follows:

"Q. Let me ask you this. You heard Mrs. Wallace [nurse] testify about the cleansing that she did and the substances that she used to cleanse the patient's arm and you've told the jury about the effect on the staphylococcus of those substances.

"I'll ask you whether or not even with that type of cleansing with those substances might staphylococcus infection still result from the necessary insertion of the needle?

"A. Yes, it might. And the reason I say that is that there are many hundreds of thousands of bacteria on each square centimeter of the surface and there on the skin and they're not only on the skin but they may be very deep in the skin, in the sweat glands and the other glands of the skin.

"And merely washing the skin with soap and water or washing it with a disinfectant by no means removes the total organism, the skin is not sterile under any condition.

"Q. Is there any way to make it sterile?

"A. There is no way of making it sterile. * * *"

Dr. Fuchs, a pathologist, elaborated upon the manner in which bacteria can get into the bloodstream whenever a needle is inserted into a vein:

"Q. Well, you anticipated my question. Then, how come if alcohol was used on three different applications on this arm the staphylococcus infection could have gotten in to the bloodstream from the needle?

"A. There are several possible explanations but I think the most significant factor is that when you clean the skin with alcohol you're only cleaning the very surface.

"Now, there are many pores in the skin, follicles, hair follicle and so on in which the concentration of bacteria is much higher than it is on the very surface.

"These pores frequently have plugs of oil that prevent alcohol from getting down into the pores. So that these bacteria will survive despite cleaning with alcohol.

"When you put in the needle it's simply impossible to go through the skin in to the vein without coming in contact with some of these pores. So that there is a distinct possibility of getting contamination and this is an inherant [sic] risk of any intravenous procedure of getting the needle temporarily contaminated on the way in to the vein.

"Q.  From your study is that the most likely mechanism of how this staphylococcus infection got in to the bloodstream?

"A.  I would consider this the most likely mechanism, yes.

"Q.  Are there other possibilities?

"A.  I suppose there are. But, this to me seems like the most reasonable explanation of what happened, yes.

"Q.  If a patient has poison oak rash as described in this record, would that make the patient more susceptable [sic] to—in getting staphylococcus auereus [sic]?

"A.  The fact that she had poison oak, it's—it would be difficult to say that that would but the fact that most rashes have a higher concentration of bacteria would indicate that possibly a larger innoculin would have been picked up by the needle going in to the vein and in that sense it would increase the likelyhood [sic], yes.

"Q.  Now, if the needle did carry bacteria in to the bloodstream in the vein in this manner would that be any evidence at all that the needle itself was infected at the time it was used?

"A.  You mean, prior to putting—

"Q.  Yes.

"A.  No. This would have no bearing on that at all.

"Q.  Is there any way to necessarily avoid in all cases this bacteria being carried in to the bloodstream if you give an I.V. injection?

"A.  Well, as far as I am aware there is no way currently known to avoid it. And most likely what happens is that with every I.V. you're introducing a certain number of bacteria in to the bloodstream and this, as I mentioned previously, is what we would call a

transient bacteremia and which produces no symptoms and no problems.

"And the persons normal host defenses will take care of the residual bacteria around the needle site at that time. Now, some patients, and it's a small percentage, but no way of usually predicting an infection, will develope [sic] at the site and the organism will grow and feed the bloodstream more profusely."

Thus, when an instrument which is itself sterile punctures the skin, it can carry any bacteria that it may encounter with it when it enters the bloodstream, and there is no precautionary procedure which can obviate this risk.

Plaintiff argues that there was no evidence that the hospital took proper precautions to sterilize the area around the insertion by using an iodine compound, Betadine or Virac, which leaves a temporary discoloration, because plaintiff saw no discoloration. Plaintiff also relies on the fact that neither plaintiff nor her visitor ever saw the nurses wash their hands, although this is a standard procedure; that a friend of plaintiff stated that the area where the I.V. was inserted looked red and pussy; and that there were staph cases among other patients, although not on the same floor as plaintiff.

We fail to see how an inference that the needle used on plaintiff was unsanitary could be drawn from the fact that other patients on other floors might also have had a staph infection at the same time. The fact that plaintiff and her visitor did not see the nurses wash their hands in her room is no evidence that they did not do so, since there was testimony that several other wash areas were available. Moreover, there was no evidence as to when plaintiff and her friend noticed that the area where the needle was inserted became red and pussy. Obviously, if the needle carried the bacteria into the bloodstream when it was inserted and a staph infection later developed, the area of her arm where the needle was inserted would eventually disclose the infection. Lastly, a physician testified that

the color stain associated with Betadine will usually disappear fairly rapidly and that the use of alcohol with Betadine will eliminate any remaining discoloration. In our view, there was simply no substantial evidence of any negligence on defendant's part presented to the jury.

■■ Finally, plaintiff argues that the doctrine of res ipsa loquitur applies to the facts of this case. We disagree. The doctrine is applicable only in cases in which the court can say that the probability of plaintiff's injury being caused by defendant's negligence is greater than the probability that the injury was due to a non-negligent cause. *Sellars v. Presbyterian Intercomm. Hospital,* 277 Or 101, 559 P2d 876 (1977); *Austin v. Sisters of Charity,* 256 Or 179, 470 P2d 939 (1970); *Kaufman v. Fisher,* 230 Or 626, 371 P2d 948 (1962). This is not such a case, because the undisputed medical testimony shows that it is impossible in all cases to prevent bacteria which is under the skin or in the pores from being introduced into the bloodstream through the insertion of an I.V. needle and that this was the "most likely" cause of plaintiff's injury. *See also Brannon v. Wood,* 251 Or 349, 358-59, 444 P2d 558 (1968):

> "The test is not whether a particular injury rarely occurs, but rather, when it occurs, is it ordinarily the result of negligence. *Kaufman v. Fisher,* 230 Or 626, 371 P2d 948 (1962). Prosser, Torts 232, § 40 (3d ed 1955).
>
> "* * * * *
>
> "* * * 'Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible.' *Siverson v. Weber,* 57 Cal2d 834, 22 Cal Rptr 337, 372 P2d 97 (1962)."

Affirmed.