Argued and submitted March 1, affirmed June 5, reconsideration denied July 19, petition for review denied August 8, 1985 (299 Or 584)

# JEFFRIES,
*Appellant,*

*v.*

# MURDOCK,
*Respondent.*

## (16-81-02353; CA A32008)

701 P2d 451

J. Michael Alexander, Salem, argued the cause for appellant. With him on the brief was Burt, Swanson, Lathen, Alexander & McCann, Salem.

William G. Wheatley, Eugene, argued the cause for respondent. With him on the brief was Jaqua, Wheatley, Gallagher & Holland, Eugene.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Plaintiff appeals the trial court's grant of a directed verdict for defendant in this medical malpractice case. He argues that evidence presented at trial was sufficient to create a jury question of defendant's negligence and that defendant's motion for a directed verdict therefore should have been denied. We affirm.

Defendant performed surgery on plaintiff to remove a subclavian aneurism which was discovered while plaintiff was in the hospital recovering from an unrelated operation. Defendant admits that, while concluding the surgery, he noticed that a nerve had been severed in the area from which the aneurism had been removed. He did not know when or how the nerve was cut. An attempt was made to repair the damage. Plaintiff now suffers from partial paralysis of his vocal cords, a condition which can result from damage to the proximal vagus nerve—the nerve that was allegedly severed.

■ Plaintiff's sole assignment of error raises the question whether sufficient evidence was introduced at trial to create a jury question regarding defendant's alleged negligence. On appeal, we must view the evidence in the light most favorable to plaintiff and give him the benefit of all reasonable inferences which may be drawn. *Simpson v. Sisters of Charity of Providence,* 284 Or 547, 549, 588 P2d 4 (1978).

Defendant was confronted with a rare situation due to the type of aneurism and its location at the base of plaintiff's neck. The aneurism had apparently developed over a period of 20 years as the result of injuries suffered by plaintiff in a car accident in 1957. One expert's testimony classified the aneurism as a "pseudoaneurism" and drew this distinction between it and a typical aneurism:

> "An aneurism describes a condition where the wall of the blood vessel becomes weakened and expands, much like the weak spot in a bicycle inner tube. The wall is there, but it's thin, weak, and balloons.
>
> "A pseudoaneurism is related to a rupture of the actual arterial wall with blood passing out through the outside of the artery, but being contained by whatever it happens to be up against. These are a little uncommon in this position [at the base of the neck], but they're quite common in other areas, particularly in the groin.

"There is no true wall of the aneurism. The only thing holding the blood in is whatever it's pushing up against, and whatever it's pushing up against becomes the wall of this— this mass."

The testimony of other expert medical witnesses was to the effect that the constant pressure of the blood which creates the "wall" of the aneurism does so through the buildup of scar tissue in the area. The continued formation of scar tissue, however, tends to create other problems, such as obstructing the flow of blood into the arm, which the medical experts unanimously testified necessitates removal of the aneurism. Defendant was aware of this potential complication and also knew that the presence of numerous other nerves and blood vessels passing through the area would present further difficulties. The undisputed testimony of the expert medical witnesses was that, even though every effort is made to prevent damage or injury to surrounding organisms during surgery of the type performed by defendant, it may be unavoidable in some operations due to complications which arise or to circumstances beyond a surgeon's control.

The hospital report and the testimony of defendant indicates that, after he made his incision, he progressively worked his way toward the aneurism in an area he described as "sort of like working down into a funnel." As defendant approached the aneurism, numerous structures and organs were separated and moved in order to reach it. The hospital report shows that one structure, which "was felt to be the vagus nerve," was isolated, although, the report continues, the "[i]dentity of any structures in thie [sic] area was quite difficult to ascertain because of dense scarring along the course of the aneurism and entrapment of adjacent structures therein." Once the aneurism was freed from surrounding organisms, both ends were clamped off and it was removed. An artificial "bridge" or prosthesis was attached to one end of the artery, which was then flushed to clear any foreign objects. A catheter was inserted several times down the other end of the artery to remove any clots which might be present, after which the prothesis was attached to that end of the artery. The area was then closed, and plaintiff was taken to the recovery room, where defendant diagnosed a marked improvement in the circulation of blood into plaintiff's arm.

An addendum to the hospital report discloses that,

during closure of the area, a nerve ending was noticed. The report indicates uncertainty as to the identity of the structure, but defendant "suspected that it was in fact the proximal vagus nerve." An attempt was made to reattach the nerve ending to an area in the scar tissue which defendant believed to be the origin of the severed nerve.

After surgery, plaintiff noticed that he was sweating on only one side of his face and head. He said that, when he asked defendant what would cause such a condition, the reply was "Horner's Syndrome."[1] Plaintiff also noticed that he had trouble speaking, in that he "couldn't talk above a whisper." He testified that the next morning he again asked defendant about his voice and that the following exchange occurred:

> "And when he came into my room, I said, 'Sit down on my bed. We got some talking to do.' And he said, 'What's that?' And I said, 'I want to know what's wrong with my voice.'
>
> "And he told me, he says, 'I cut the nerve to your vocal cord.' And so I said, 'Well, what does that mean?' And he said, 'Whatever your voice will be like in—whatever your voice is like in four months, will be that way the rest of your life.'
>
> "And I said, 'Well, how did this all happen?' He said, 'I'm sorry, I accidentally cut the nerve to your vocal cord.' "

Plaintiff filed a complaint charging defendant *inter alia,* with negligence in severing the vagus nerve causing "total paralysis of the right vocal chords" resulting in "hoarseness, a permanent, partial loss of his voice, an inability to speak properly and difficulty in breathing." After all the evidence was presented, defendant moved for a directed verdict. The motion was granted. This appeal followed.

Plaintiff argues that a jury question was created either directly, by evidence of defendant's negligence, or circumstantially under the doctrine of *res ipsa loquitur.* Despite plaintiff's assertions to the contrary, his first argument cannot be sustained, because the jury could not have decided in this case that defendant had failed to meet the

---

[1] Horner's Syndrome results from a malfunction or injury to the sympathetic nervous chain, which is located in close proximity to the subclavian artery, the artery from which the aneurism was removed. The characteristics of this condition include the drooping of an eyelid, a narrowing of the pupil in the same eye, the absence of sweating on the same side of the face and upper extremities and, in some cases, a receding of the eyeball into the eye socket.

applicable standard of care for a surgeon in the relevant community.

■ The Supreme Court has held that, in certain cases of medical malpractice, a jury is fully capable of determining whether a physician or surgeon has engaged in reasonable conduct and that such a determination can be made without the assistance of expert medical testimony establishing the appropriate standard of care. *Simpson v. Sisters of Charity of Providence, supra,* 284 Or at 557; *Getchell v. Mansfield,* 260 Or 174, 179-80, 489 P2d 953 (1971). The failure to sterilize surgical instruments before an operation is an example of such a case. *King v. Ditto,* 142 Or 207, 214, 19 P2d 1100 (1933). However, in the great majority of cases expert testimony is required.

> "In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community. The conduct of the defendant professional is adjudged by this standard. *Without such expert testimony a plaintiff cannot prove negligence.* The reason for this rule is that what is reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury." *Getchell v. Mansfield, supra,* 260 Or at 179. (Emphasis supplied.)

The case before us is precisely the type of case that the Supreme Court has said requires expert testimony. Defendant was confronted with an unusual operation and encountered difficult conditions during the operation itself, due to the presence of extensive scar tissue. The uncontradicted testimony of the expert medical witnesses established that defendant's first priority was removal of the subclavian aneurism which threatened plaintiff with the possible loss of his arm and, perhaps, his life. The difficulty of this particular operation and the inherent risks of any surgery were said to be relevant considerations. The expert medical witnesses offered testimony concerning the applicable standard of care and that, in the light of the above factors, defendant did not breach the standard of care, even though the nerve had been severed.

■ Although plaintiff testified that defendant admitted to cutting the nerve "accidentally," the significance of the alleged statement was negated by both the testimony of the expert witnesses that the cutting of the nerve itself did not

44

indicate any failure by defendant to exercise the applicable ordinary skill and care of a surgeon in the community and by plaintiff's failure to present *any* evidence to the contrary. We therefore reject plaintiff's claim that there was direct evidence of defendant's negligence sufficient to create a jury question.

■    We similarly reject plaintiff's claim that sufficient evidence was adduced under the doctrine of *res ipsa loquitur* to send the issue of defendant's negligence to the jury. The doctrine of *res ipsa loquitur* was first applied in Oregon in a medical malpractice case in *Mayor v. Dowsett*, 240 Or 196, 400 P2d 234 (1965). The conditions which must exist for the doctrine to apply are:

> "(1)  [T]he accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff * * *." *Mayor v. Dowsett, supra,* 240 Or at 214 (*citing* Prosser, *Law of Torts* (2d ed) 201-02, § 42).

It is not disputed that the second and third elements exist in this case, but the first element has clearly not been met by plaintiff.

In adopting *res ipsa loquitur* for medical malpractice cases, the court in *Mayor* followed the lead of the California Supreme Court in *Siverson v. Weber,* 22 Cal Rptr 337, 57 Cal 2d 834, 372 P2d 97 (1962), which addressed the first element of the doctrine, cited above, in the context of medical cases.

> "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation.

> "To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, *the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause*

*for which the defendant is not responsible.*" 22 Cal Rptr 339-40. (Citations omitted; emphasis supplied.)

This position has been consistently applied in Oregon since its adoption in *Mayor v. Dowsett, supra. See Sommers v. Sisters of Charity of Providence,* 277 Or 549, 561 P2d 603 (1977); *Dacus v. Miller,* 257 Or 337, 479 P2d 229 (1971); *Brannon v. Wood,* 251 Or 349, 444 P2d 558 (1968). There was *no* medical testimony establishing that the cutting of plaintiff's vagus nerve was more probably than not the result of negligence, a conclusion that the trial judge properly reached in his role of determining whether the case should be submitted to the jury. *Kaufman v. Fisher,* 230 Or 626, 639, 371 P2d 948 (1962). Accordingly, the trial court was correct in holding that the doctrine of *res ipsa loquitur* was not applicable.

Affirmed.