Argued and submitted January 6, 2011, affirmed May 31, petition for review allowed December 27, 2012 (353 Or 127)

Peggy N. TREES,
*Plaintiff-Appellant,*

*v.*

Julio A. ORDONEZ, M. D.
and Greater Portland Neurosurgical Center, P. C.,
*Defendants-Respondents,*

*and*

Werner R. Meier, M. D.;
W. R. Meier, M. D., P. C.;
David Jay Silver, M. D.;
and David J. Silver, M. D., P. C.,
*Defendants.*

Multnomah County Circuit Court
060505489; A139893

279 P3d 337

Rick Pope argued the cause for appellant. With him on the briefs were George Kirklin and Kirklin Thompson & Pope LLP.

Michael T. Stone argued the cause and filed the briefs for respondents.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.*

ORTEGA, P. J.

---

* Brewer, J., *vice* Edmonds, S. J.

**ORTEGA, P. J.**

Plaintiff Peggy Trees appeals from a judgment entered after the trial court granted a directed verdict to defendants, Dr. Julio Ordonez and his professional corporation, in a medical malpractice case.[1] Ordonez, a neurosurgeon, performed surgery to fuse three vertebrae in plaintiff's neck, and she later suffered adverse medical consequences that required additional surgeries and left her with permanent disabilities. Plaintiff filed a negligence action against defendant and two other doctors who participated in her care, claiming, among other things, that Ordonez breached the standard of care by failing to properly place and secure the plate used to stabilize plaintiff's cervical spine, resulting in plaintiff's injuries. Plaintiff's case at trial included expert testimony from a biomechanical engineer about the function of the plate, opining that Ordonez's installation of the plate was inconsistent with the manufacturer's explicit instructions.

Defendant moved for a directed verdict on the grounds that plaintiff failed to provide evidence of causation or negligence. The trial court granted a directed verdict, concluding that, although there was sufficient evidence of causation, plaintiff had failed to provide expert testimony that defendant violated the applicable standard of care. Plaintiff appeals from the resulting judgment, assigning error to the trial court's grant of the directed verdict and its evidentiary ruling that prevented her expert biomechanical engineer from testifying about matters related to causation. Defendant cross-assigns error, asserting that the trial court allowed objectionable evidence into the record and that the trial court should have granted a directed verdict on causation. Because we affirm on the appeal issues, we need not address the issues raised in defendant's cross-assignments of error.

## I. FACTS

In an appeal from a directed verdict, we view the evidence in the light most favorable to the nonmoving party and

---

[1] For ease of reference, we refer to Dr. Ordonez and Greater Portland Neurosurgical Center, P.C., collectively as defendant.

extend to that party the benefit of any inferences that can be drawn from the evidence. *Shockey v. City of Portland*, 313 Or 414, 422-23, 837 P2d 505 (1992), *cert den*, 507 US 1017 (1993). Accordingly, we state the facts in the light most favorable to plaintiff.

In order to perform an anterior cervical decompression and fusion on plaintiff, Ordonez had to approach through plaintiff's neck and retract her esophagus, hypopharynx, and trachea away from the anterior surface of her cervical spine. Ordonez removed bone and intervertebral disc material from the spaces between C4 and C5 and between C5 and C6 and placed bone grafts into the spaces between the vertebrae. Ordonez then stabilized the vertebrae and grafts by affixing a titanium plate to the anterior surface of plaintiff's cervical spine with bone screws driven into plaintiff's vertebrae. Ordonez used a "size 28" Cervical Spine Locking Plate, which is affixed to the vertebrae by bone screws with expanding heads. To prevent the bone screws from "backing out," the physician must also insert and tighten "locking screws" into the heads of the bone screws.

Approximately 36 hours after the surgery, plaintiff complained of severe neck pain and the sensation that she had a "plate in her throat." A subsequent image of the area showed a large abscess directly in front of the plate. During a second surgery to address the abscess, Ordonez discovered that the original surgical wound around the cervical spine was contaminated with oral bacteria and amylase, which could be caused by a perforated esophagus. He removed purulent material from the neck, installed a drain at C4, and began irrigating the wound with antibiotics. Despite these efforts, over the next several days, plaintiff's condition worsened and she exhibited the beginning signs of paralysis.

Plaintiff underwent three additional surgeries to remove epidural abscesses that were closing off her spinal canal. In the last of these surgeries, Dr. Silver, filling in for Ordonez, removed the plate, screws, and grafts installed in the first surgery and placed plaintiff in a halo framework to stabilize her spine.

Although plaintiff's condition improved, she required additional surgeries in the months that followed.

Ultimately, her entire cervical spine was fused and she now suffers from weakness in both arms, partial paralysis of the left upper arm, and unremitting pain, and she cannot work in her profession.

Plaintiff's medical malpractice complaint against the various defendants[2] sought economic and noneconomic damages and alleged, among other things, that Ordonez failed to exercise due care during the first surgery to avoid perforating plaintiff's esophagus or hypopharynx. Specifically, plaintiff alleged that Ordonez failed to properly place and secure the plate and its screws to the anterior surface of the vertebrae, which resulted in the perforation and erosion of plaintiff's esophagus or hypopharynx. Plaintiff also alleged that defendant negligently failed to detect and repair that perforation, and she raised other allegations relating to informed consent that are not at issue in this appeal.

At trial, plaintiff presented testimony from Dr. Tencer, who teaches biomechanics in the department of orthopedic surgery at the University of Washington. Trained as an engineer and not as a medical doctor, Tencer testified that he performed a biomechanical assessment of Ordonez's installation of the plate in plaintiff, based on plaintiff's medical records and on manuals from Synthes, the manufacturer of the plate. Tencer opined that Ordonez's choice and installation of a size 28 plate was improper. He noted that longer plates were available for defendant's use, and that the use of the size 28 plate forced Ordonez to angle the screws to such an extent that they did not "sit down" in the plate. According to Tencer, because the screws protruded above the surface of the plate, they came into contact with the soft tissue of the esophagus, forcing the esophagus tissue to conform around the sharp edges of the screw heads. He also testified that the instruction manual that accompanied the plate specifically warned that improper screw and plate fixation created a risk of esophageal erosion.[3]

---

[2] Before trial, plaintiff voluntarily dismissed her actions against the other doctors and their professional corporations, so they are not involved in this appeal.

[3] The court sustained an objection to the latter testimony as hearsay and allowed it only for the purpose of showing notice to Ordonez of the risk of esophageal erosion.

Tencer explained that, from a biomechanical standpoint, if the screws are not completely threaded into the vertebrae they can pop out of the plate, allowing the plate to loosen. He also testified that the bone screws are designed with sharp expanding edges so that when the locking screw is inserted into the bone screw, it creates a mechanical lock by forcing the head of the bone screw outwards against the inner edge of the hole in the plate. Accordingly, Tencer opined that the soft tissue of the esophagus must be protected by ensuring that the screws sit flush with the plate. If the screws are not below or flush with the surface of the plate, the locking screws can distort the bone screw edges and result in a sharp edge protruding above the plate. Tencer explained that X-rays of plaintiff revealed that five of the six screws used by defendant were not flush with the plate's surface; accordingly, he opined that the locking mechanism was not functioning properly. He noted that, from a biomechanical standpoint, the situation that existed after plaintiff's surgery presented an opportunity for plaintiff's esophagus to have contact with the protruding screws. In addition, Tencer testified that Ordonez's failure to conform the plate to the curvature of plaintiff's spine also presented a biomechanical problem that could affect the performance of the plate.

At the close of plaintiff's case, defendant moved for a directed verdict on the grounds that (1) plaintiff failed to present expert medical testimony to establish the standard of care and that Ordonez breached that standard; (2) plaintiff failed to provide evidence of causation; and (3) the doctrine of *res ipsa loquitur* does not apply to this case because there was no evidence that plaintiff's was the type of injury that would not have occurred in the absence of negligence.

As to negligence, defendant argued that, because Tencer testified strictly as to the biomechanical function of the medical hardware—the plate—and not as a medical expert, plaintiff had failed to present a jury question as to negligence; Tencer's testimony did not establish the standard of care applicable to a neurosurgeon in the performance of this surgery in this circumstance. As to causation, defendant contended that, although there was evidence that the screws

protruded, there was no evidence about where the perforation occurred or that the protruding screw caused a perforation, thus requiring the jury to speculate about what had happened. Finally, defendants maintained that *res ipsa loquitur* did not apply because plaintiff did not introduce any evidence that the injury that occurred was of the type that would not have occurred in the absence of negligence.

After denying defendant's motion for directed verdict on causation, the court granted a directed verdict as to negligence, concluding that expert testimony was required to demonstrate that Ordonez was negligent because it was not within the "capability of a jury to ascertain whether during an anterior cervical decompression and fusion surgery an esophageal perforation does not occur unless someone was negligent." In the court's view, Tencer's testimony and accompanying evidence from the manufacturer

> "simply establish[ed] the ideal placement of the plates and screws. It is unfair and legally unsupported to compare [defendant's] surgery to the ideal. [Defendant's] actions must be compared to other neurosurgeons. Expert testimony is required to establish whether the [d]efendant's surgery fell below the standard of care of a reasonable neurosurgeon performing the same surgery."

## II.  ANALYSIS

On appeal, plaintiff assigns error to the trial court's entry of a directed verdict, contending that Tencer provided sufficient expert testimony to establish the applicable standard of care and that Ordonez breached that standard. Alternatively, plaintiff argues that expert testimony on the standard of care was not necessary because this case is comparable to cases involving a "foreign object" in the body so that Ordonez's negligence was within the common knowledge and understanding of the jury, or the doctrine of *res ipsa loquitor* applies so that the jury can infer negligence and causation.

A.  *Tencer's testimony*

A directed verdict is appropriate only if a defendant was entitled to judgment as a matter of law. Accordingly, we

must first determine whether, as a matter of law, the evidence adduced by plaintiff as to negligence was sufficient to submit the issue to the jury. *Vandermay v. Clayton*, 328 Or 646, 655, 984 P2d 272 (1999).

Plaintiff argues that, although Tencer is not a medical doctor, he had sufficient experience and training with the Synthes plate to offer medical expert testimony about the standard of care and Ordonez's breach of that standard. In particular, plaintiff contends that Tencer's testimony was sufficient to establish that there is a uniform national standard for use of the Synthes plate by surgeons that does not permit any protrusion of a screw head above the surface of the plate because of the danger of injury to the esophagus. As for evidence that Ordonez breached that standard, plaintiff points to Tencer's testimony that Ordonez's "plate-construct" violated uniform and commonplace standards for surgeons using the plate, that Ordonez's conduct was not in accordance with the manufacture's minimum installation recommendations, and that there was physical evidence that his installation of the plate left the screws protruding above the surface of the plate, which can damage the esophagus. According to plaintiff, then, with all reasonable inferences drawn in her favor, Tencer's testimony established that, by leaving five of the six screws protruding, Ordonez breached the applicable standard of care.

Defendant counters that plaintiff failed to provide expert medical testimony that established the standard of care exercised by ordinarily careful neurosurgeons in this or a similar community in performing the surgery under the circumstances of this case, or that Ordonez breached that standard in any way. Defendant maintains that inherent in the trial court's ruling is its conclusion that Tencer was not qualified to give expert medical testimony regarding negligence in this case. Tencer is a biomechanical engineer who has tested the plate, but has never actually participated in a surgery where the plate was placed in a patient, and accordingly he is not qualified to testify as to the standard of care required in performing the surgery at issue. Rather, his testimony addressed only whether Ordonez's installation of the plate presented any biomechanical problems.

Before addressing the substance of Tencer's testimony, we point out that Tencer's competency to testify as an expert is not presented on appeal. During Tencer's testimony, defendant at times objected to the scope of Tencer's testimony when he strayed from offering an opinion on the biomechanical function of the plate into medical expert testimony. Those objections were sustained. Plaintiff has not challenged those evidentiary rulings on appeal with the exception of an instance where the trial court sustained an objection to Tencer testifying about matters related to causation, but that testimony is not relevant to plaintiff's first assignment of error. Accordingly, we review Tencer's testimony to determine if it provided evidence of defendant's negligence, and conclude that it did not.

A physician has a duty to exercise the degree of care, skill, and diligence that an ordinarily careful practitioner in the same or similar circumstances in the community or a similar community would have exercised. ORS 677.095(1); *see Dowell v. Mossberg*, 226 Or 173, 181, 355 P2d 624 (1960), *on reh'g*, 359 P2d 541 (1961). In most professional negligence cases, expert testimony is required to establish the reasonable practice in the community—*viz.*, the standard of care. *Getchell v. Mansfield*, 260 Or 174, 179, 489 P2d 953 (1971). The conduct of the defendant doctor is then adjudged against that standard. Without expert testimony, a plaintiff cannot prove negligence because what is reasonable conduct for a professional in certain circumstances is ordinarily not within the knowledge of the jury. *Id.* Although an expert witness in a medical malpractice action need not be a practitioner in the same specialty as defendant or have a medical degree, the witness must be familiar with the method of treatment customarily used by a reasonably careful practitioner in the community or a similar community under circumstances similar to those that confronted the defendant. *Burton v. Rogue Valley Medical Center*, 122 Or App 22, 26, 856 P2d 639, *rev den*, 318 Or 24 (1993).

Tencer's testimony failed to establish the standard of care applicable to Ordonez. Most importantly, Tencer testified about the biomechanical function of the plate during surgery, but did not provide the jury with legally sufficient

evidence of the care, skill, and diligence that was required of a reasonably careful practitioner when performing plaintiff's surgery under these circumstances. Throughout the course of his testimony, the trial court sustained all objections when he strayed from opining about the biomechanics of the plate into the realm of medical expert testimony. For example, after the trial court sustained an objection to Tencer's testimony about whether there was a "medical problem" as to the size of the plate used, the trial court explained to the jury the appropriate scope of Tencer's testimony:

> "[M]embers of the jury, just so you understand why the objection is made, Professor Tencer is an expert in this biomechanical—in the biomechanical engineering field, and he does have special expertise in these types of plates, but he is not a medical doctor and he doesn't have medical expertise. But to the extent that sometimes he has to explain things as to where they are in the body, and that sort of thing, be sure you separate what he says about the mechanics, which is what he can testify to. And if he alludes to anything that has to do with the surgery itself, in terms of how it applies to this particular case or any resulting medical condition or situation, you need to disregard that at this point."

Tencer's testimony about plate placement and protruding screws established that, from a biomechanical standpoint, the installation with the screws protruding presented a "biomechanical problem" in that the plate is designed so that the heads of the screws lay beneath the surface of the plate so that they do not damage soft tissues. Tencer's testimony failed to bridge the gap, however, between the biomechanical construct of the plate and the methods with which they were intended to be installed and whether compliance with those same methods as a medical matter set the standard of care for Ordonez. Put another way, Tencer's testimony established what the plate is designed to do and the biomechanical problems that are presented if the plate is not installed in the manner recommended by the manufacturer, but it does not establish, from a medical standpoint, that an ordinarily careful surgeon exercising the degree of care, skill, and diligence required when performing an anterior cervical decompression and fusion in the same or similar circumstances and community would install the plate in the manner

that Tencer described. As a result, the trial court did not err in concluding that Tencer's testimony failed to provide the jury with legally sufficient evidence of a breach of the standard of care applicable to Ordonez.

B. *Whether plaintiff's case can proceed to jury without expert testimony*

Next, we address plaintiff's alternative arguments to determine if the lack of expert testimony on the standard of care was fatal to plaintiff's case. In certain cases of medical malpractice, such as where there is a failure to sterilize surgical instruments before an operation, "a jury is fully capable of determining whether a physician or surgeon has engaged in reasonable conduct and that such a determination can be made without the assistance of expert medical testimony establishing the appropriate standard of care." *Jeffries v. Murdock*, 74 Or App 38, 43, 701 P2d 451, *rev den*, 299 Or 584 (1985). "However, in the great majority of cases expert testimony is required" because " 'what is reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury.' " *Id.* (quoting *Getchell*, 260 Or at 179).

Plaintiff here contends that "leaving sharp screw heads protruding into [plaintiff's] esophagus is a matter of common understanding" such that expert testimony is not required to establish that doing so was negligent. She argues that the protruding sharp screw heads were "foreign objects" in her body. This case, however, is not a "foreign object" case. The medical malpractice cases cited by plaintiff all involve instances where a physician unintentionally left an object in a patient's body after surgery. *See Piehl v. The Dalles General Hospital*, 280 Or 613, 618-19, 571 P2d 149 (1977) (holding that a jury could conclude without the aid of expert testimony that a physician was negligent for failing to discover and remove a laparotomy sponge from a patient following surgery); *Nicholson v. Sisters of Charity*, 255 Or 251, 463 P2d 861 (1970) (coming to the same result where a surgeon left a safety pin in the patient's abdomen); *Fieux v. Cardiovascular & Thoracic Clinic, P.C.*, 159 Or App 637, 642, 978 P2d 429, *rev den*, 329 Or 318 (1999) (holding that a jury could conclude without the aid of expert testimony that a clamp is not normally left inside a patient unless someone is negligent). The

screws installed by Ordonez were not "foreign objects" within the meaning of the term as used in those cases; rather they were part of the necessary medical hardware used in the procedure and were intended to remain in the body. Accordingly, expert testimony was required to establish the standard of care for installing such hardware under these circumstances, testimony that Tencer did not and could not provide.

Plaintiff insists that, even if Tencer's testimony did not establish the standard of care, his testimony in conjunction with additional evidence sufficiently informed the jury of the relevant issues needed to decide negligence, such that expert testimony was unnecessary. In particular, plaintiff relies on Tencer's testimony about the technical problems with defendant's plate installation, the manufacturer's brochures that notified users to check the screw heads at the end of surgery to ensure that they were flush with the plate surface, and the X-rays showing the protruding screw heads.

However, unlike the types of cases where expert medical testimony has not been required—*see, e.g., King v. Ditto*, 142 Or 207, 214, 19 P2d 1100 (1933) (remarking that expert medical testimony would not be required if a surgeon operated without sterilizing his instruments)—this case involves a complex medical issue requiring the assistance of expert medical testimony. Without such testimony, the jury could not determine what the standard of care required in terms of using the plates under the complex medical circumstances presented here in order to prevent the biomechanical result that Tencer described.

Finally, plaintiff argues that the jury could decide the case as presented under the doctrine of *res ipsa loquitur*, which allows a jury to infer both negligence and causation if the injury that occurred is of the kind that more probably than not would not have occurred in the absence of negligence on the part of the defendant. *Fieux*, 159 Or App at 640. To invoke that doctrine, the plaintiff must establish "that there is an injury, that the injury 'is of a kind which ordinarily does not occur in the absence of someone's negligence,' and that the negligence that caused the event was more probably

than not attributable to a particular defendant or defendants." *Id.*

Oregon courts have been reluctant to apply *res ipsa loquitur* in medical malpractice cases except in "foreign object" cases. That reluctance is based on the concern that the doctrine will impinge on the "established principle that a physician is not * * * 'a warrantor of cure, and if a good result does not ensue from his efforts the doctrine of *res ipsa loquitur* is not available to his erstwhile patient.' " *Mayor v. Dowsett*, 240 Or 196, 400 P2d 234 (1965) (quoting *Ritter v. Sivils*, 206 Or 410, 413, 293 P2d 211 (1956)). Nevertheless, the doctrine may apply if it can be considered common knowledge among laymen that the injury would not have occurred without negligence and that the negligence was more probably than not attributable to the defendant. As previously explained, however, we conclude that this case involved complex medical issues and it is not common knowledge among laymen that a perforated esophagus would not have occurred during plaintiff's surgery in the absence of negligence and that such negligence was more probably than not attributable to Ordonez as opposed to someone else involved in the procedure or in manufacture of the plate.

Alternatively, *res ipsa loquitur* can apply if there is medical testimony that the injury was more probably than not the result of negligence. *Jeffries*, 74 Or App at 44-45. However, "the mere fact that the injury suffered by a patient following an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation." *Mayor*, 240 Or at 216. Plaintiff points to testimony of Dr. Silver, a defense witness who performed one of the later surgeries, stating that he had never encountered a perforated esophagus in the performance of an anterior cervical fusion and when asked if an esophageal perforation noted early in the post-operative period is usually attributable to a "technical error," he answered that that statement was "probably true." Silver's testimony does not establish the required inference. His statement that he has never encountered a perforated esophagus establishes nothing more than that such a result is rare during this type of surgery; the statement does not by itself

demonstrate that negligence probably occurred. Silver's statement that it is "probably true" that such an injury is usually attributable to "technical error" was equivocal, inexact, and inconsistent with his earlier testimony that he "didn't know" whether esophageal perforations are usually attributable to an error by the surgeon. Further, Silver offered testimony that defendant's conduct in this case was within the standard of care and plaintiff offered no medical testimony to the contrary. Where, as here, " 'risks are inherent in an operation and an injury of a type which is rare does occur,' " Silver's equivocal and inconsistent testimony does not rise to the level of medical testimony that, "in light of past experience, such an occurrence is more likely the result of negligence than some cause for which [Ordonez] is not responsible." *See Jeffries*, 74 Or App at 44-45 (quoting *Siverson v. Weber*, 22 Cal Rptr 337, 339-40, 372 P2d 97, 100 (1962)); *see also Brannon v. Wood*, 251 Or 349, 361, 444 P2d 558 (1968) (holding that *res ipsa loquitor* did not apply when no doctor testified that under the facts specific to that case the injury that occurred was more likely than not the result of negligence). Accordingly, the trial court did not err in concluding that *res ipsa loquitor* did not apply in this case.

In sum, this case is the type in which expert medical testimony was required to establish the standard of care and whether defendant breached the standard of care. The testimony of plaintiff's expert witness was limited to the biomechanical aspects of the hardware used in plaintiff's surgery, but did not proffer any expert medical testimony that properly established the standard of care applicable to plaintiff's surgery. Accordingly, the trial court did not err in granting a directed verdict on the issue of negligence.

Affirmed.