Argued November 3, reversed and remanded December 20, 1977

PIEHL, *Plaintiff,*
*v.*
THE DALLES GENERAL HOSPITAL, *Appellant,*
DEY, *Respondent.*

DEY, *Respondent,*
*v.*
THE DALLES GENERAL HOSPITAL, *Appellant.*
(No. 14264, SC P-2515)
571 P2d 149

Gerald R. Hayes, Portland, argued the cause and filed briefs for appellant.

Bruce Spaulding, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, argued the cause and filed a brief for respondent.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, Lent, and Linde, Justices.

HOLMAN, J.

## HOLMAN, J.

Plaintiff was operated on for stomach ulcers by the defendant Dey, a surgeon. During the operation, which was performed at The Dalles General Hospital, which is also a defendant, a piece of material known as a laparotomy sponge was left in plaintiff's abdomen. Plaintiff brought an action for damages against both defendants, each of whom filed pleadings requesting indemnification from the other for any judgment plaintiff might receive. The trial of the case resulted in a jury verdict in favor of plaintiff against both defendants and in a directed verdict requiring the hospital to indemnify the doctor for any loss he might suffer from the judgment. The hospital appeals. There are no issues between plaintiff and defendants. The only points raised concern the indemnity rights between defendants.

The hospital first claims that the trial court erred in directing a verdict requiring the hospital to indemnify the surgeon. The hospital contends that there was evidence from which the jury could have found that the doctor was personally negligent (as differentiated from being responsible on the basis of *respondeat superior* because of the negligence of the nurses). If this was the case, the doctor is not entitled to indemnity.[1] This contention requires a detailed synopsis of the facts.

Present in the operating room were the defendant surgeon, a physician who assisted the surgeon, an anesthetist, a circulating nurse, a scrub nurse, and the surgeon's office nurse, who, because of a shortage of personnel at the hospital on Saturday mornings, was pressed into duty as an aide. The scrub nurse and the circulating nurse were the general employees of the hospital which hired, trained and paid them, and which assigned them to duty in the operating room. The hospital billed the patient for the nurses' services

---

[1] *See* Restatement of the Law of Restitution § 88 (b).

and for the use of the operating facilities of the hospital. The other participants were not hospital employees.

It was the duty of the circulating nurse and of the scrub nurse to keep track of the sponges which were used in the operation. There were two kinds of sponges used—laparotomy sponges and smaller 4″ x 4″ sponges. Laparotomy sponges come in packages of five; the 4 by 4's come in packages of 10. The nurses count the sponges when they prepare the surgery for the operation. There is no count made of the sponges as they are used. After the sponges are used and removed, they are laid out and counted together with the unused sponges in units of five for the laparotomy sponges and in units of 10 for the 4 by 4's to see whether they are in accord with the number of packages used. This count is made twice—once before the abdomen is closed and once afterwards. It is not the practice of the surgeon to keep track of the number of sponges used; the nurses report to him on whether the sponge counts check out. They reported in this instance that the count did check out and they made the appropriate notation in the medical record.

The sponges are not sponges at all but are made of surgical gauze. A laparotomy sponge is about 14 inches square and is composed of two layers of ribbed gauze sewn together around the edges. At one corner there is a knitted loop attached, which is about three-eighths of an inch in width and about 5 inches long. X-ray opaque material is sewn into one corner of the sponge. The sponge left in plaintiff was discovered by this means in the course of a routine postoperative x-ray. Laparotomy sponges are usually used to pack other organs away from the operative area and to wipe off organs that are covered with blood. 4 by 4's are usually used to soak up blood. In the present instance the laparotomy sponge in question was used by the defendant doctor to pack the colon away from the operative area which was at the outlet of the stomach. He testified that he used two or three laparotomy

sponges in the course of the operation and that the
bleeding in the operation was minimal, which, by
illustration, was about 200 cc's or two-fifths of a pint.

The defendant surgeon, who was the only medical
witness, testified as follows:

"Q.　* * *.

"Doctor, you said that you were the one that put the
sponges in and you were the one that took those out that
were taken out of the body cavity; can you explain to the
jury how it is that you would not be able to see a sponge
or might miss a sponge inside the body cavity after a
surgery like this?

"A.　Well, as I stated a little beforehand, we use the
sponge to pack away the colon so that we can incise into
the duodenum to stop the bleeding and do a pyloroplasty
so the pylorus didn't close down. There is brisk bleeding,
not enough to transfuse them, but enough bleeding it
will soak up a lot of sponges and it can also soak up a
sponge that was used away—to pack away the colon,
even though it looks big when it is wet and squeezed
down it is not that big.

"Q.　How big is it?

"A.　This sponge, when it is soaked and packed down
it is not big at all.

"Q.　Is it bigger than a turkey egg?

"A.　I've never seen a turkey egg.

"* * * * *.

"Q.　* * *. Well, is it something that we could
recognize and compare the size of it with when it was in
there?

"A.　I would say this would be about a third the size
it is now as it stands there.

"Q.　Now that—see, I am trying to get something in
the record.

"A.　It's very hard to describe anything but a soaked
sponge.

"Q.　Okay, go ahead.

"A.　And it gets soft and it gets a thin coating of
blood on it that makes it look like a normal organ inside
the abdomen so by feeling or by looking at it it may not
be possible to tell.

[ 617 ]

"Q. Well, aren't you able to dig around there and be sure that you have felt of every place inside the body cavity?

"A. We take out all the sponges we can see or feel, if we can feel them; after a pyloroplasty it's a potentially infected area and we don't like to dig around and spread the infection around. We open it to the bowel and the bowel obviously contains bacteria, you don't want to spread the bacteria into the abdominal cavity. After a normal search we wait for the sponge count, if the sponge count is correct we don't have any reason to search again. The other thing is that the normal organs inside the abdomen, the less handling we do the quicker they come back. In other words, after any operation the bowels get paralyzed, we call it an ilius, and the less handling of the bowel we do the less protracted the paralysis is. In other words, the patient gets well a little faster.

"* * * * *.

"Q. Is that an important reason why it is better for the surgeon to rely on the ladies for the sponge count than to poke around to be sure they can't find another one?

"A. We poke around, we get all the sponges we can and this is the reason to do the sponge count to be sure there is not one left inside. If the sponge count is correct there is no reason to believe there is a sponge inside the abdominal cavity or in the wound."

The surgeon's contention is stated as follows:

"* * * We submit that laymen are not competent to determine whether or not it would be proper medical treatment for the surgeon to have done anything more to look for a sponge and we submit that based on that record there was no evidence that Dr. Dey was negligent personally in failing to make a more thorough search among the patient's intestines for a sponge instead of relying upon the trained competent nurses for the count."

■ It is our conclusion that despite the lack of other expert testimony, a jury of laymen could find that even a summary "poking around" for all the sponges which could be "seen or felt" would, in the exercise of

ordinary care, have resulted in the discovery of something *the size* of a laparotomy sponge.[2] It was not used as a soaking tool; there was minimal bleeding to disguise it; although the doctor could not be expected to count the number of sponges, there were only two or three used in the operation; and there was no emergency situation in which the condition of the patient made time a critical factor. In *Harle v. Krchnak,* 422 SW2d 810, 815 (Tex Civ. App. 1967), *overruled on other grounds by Sparger v. Worley Hospital, Inc.,* 547 SW2d 582, 585 (Tex 1977), the court said:

> "* * * Ordinarily what constitutes reasonable care is a question for the jury. There is evidence that appellant exercised some degree of care in that he made a visual inspection of the operational area and directed that a sponge count be made. Whether this amounted to reasonable care under the circumstances was a question for the jury."

*See also Burke v. Washington Hospital Center,* 157 US App D.C. 253, 255, 475 F2d 364, 366 (1973).

Because we believe there was evidence from which the jury could have found the doctor was actively negligent in not discovering and removing an object as large as a laparotomy sponge, the trial court was in error in directing a verdict in favor of the defendant surgeon on the issue of indemnity.

■ The hospital also contends the trial court erred in failing to grant a motion for a directed verdict in its favor and against the surgeon on the hospital's claim for indemnity. There is no doubt that the nurses were regular employees of the hospital and that they were

---

[2] In *Carruthers v. Phillips,* 169 Or 636, 644, 131 P2d 193 (1942), it was indicated in dictum that if a sponge was shown to have been inserted in the body in the exercise of proper procedure (which was not the case there), the propriety of its removal *might* be the subject of expert testimony. Despite this speculative dictum, the great weight of authority is to the effect that expert testimony concerning whether it was negligence for a surgeon not to remove a sponge from the body at the completion of an operation is unnecessary. See compilation of cases cited in annotations, "Malpractice—Necessity of Expert Evidence," 141 ALR 5, 24 (1942), and "Malpractice—Expert Witness—Necessity," 81 ALR2d 597, 641 (1962).

negligent. The hospital contends, however, that at the time the sponges were counted the nurses were the loaned servants of the surgeon, who had the right to control their activities, and not the servants of the hospital; therefore, the surgeon had responsibility for their negligence.

The hospital can act only through its employees. It furnished services to plaintiff through the work of the nurses for which it was being paid by plaintiff. It owed a duty to plaintiff not to perform these services negligently. That duty was breached when the nurses miscounted the sponges. There was no disproportion in the character of the duty owed to plaintiff by each defendant. The gravity of the fault of the nurses was as great as any fault that could have been committed by the surgeon. Therefore, there is no basis for indemnity to the hospital. Regardless of whether or not the nurses were the loaned servants of the surgeon for some purposes, they remained servants of the hospital in carrying out the work for which it was being paid by plaintiff.

■ The basis for indemnity between tortfeasòrs involves the equitable distribution of responsibility,[3] and there can be no all-encompassing rule. Prosser, The Law of Torts 313 (4th ed 1971), has the following to say:

> "Out of all this, it is extremely difficult to state any general rule or principle as to when indemnity will be allowed and when it will not. It has been said that it is

---

[3] *See* Leflar, *Contribution and Indemnity Between Tortfeasors,* 81 Pa L Rev 130, 146-47 (1932):

"* * * Other types of the right to indemnity are commonly called quasi contractual, or arising out of a 'contract implied at law.' Indemnity between persons liable for a tort falls within this type of case. As between such persons, the obligation to indemnify is not a consensual one; it is based altogether upon the law's notion—influenced by an equitable background—of what is fair and proper between the parties. * * *. The quasi contractual idea of unjust enrichment of course underlies any holding that one who has been compelled in discharging his own legal obligation to pay off a claim which in fairness and good conscience should be paid by another can secure reimbursement from that other. * * *." (Footnote omitted.)

permitted only where the indemnitor has owed a duty of his own to the indemnitee; that it is based on a 'great difference' in the gravity of the fault of the two tort-feasors; or that it rests upon a disproportion or difference in character of the duties owed by the two to the injured plaintiff. Probably none of these is the complete answer, and, as is so often the case in the law of torts, no one explanation can be found which will cover all of the cases. Indemnity is a shifting of responsibility from the shoulders of one person to another; and the duty to indemnify will be recognized in cases where community opinion would consider that in justice the responsibility should rest upon one rather than the other. This may be because of the relation of the parties to one another, and the consequent duty owed; or it may be because of a significant difference in the kind or quality of their conduct." (Footnote omitted.)

The hospital continues to contend that it is only vicariously liable for the negligence of the nurses and that this is important in its right to indemnity. In some cases of indemnity the fact of the vicarious liability of the claimant is important, but this is not so in the present situation. Assuming that the surgeon was personally negligent, so also were the nurses; and no reason exists to choose one or the others as more blameworthy. If, for the purposes of indemnity, the hospital were permitted to disassociate itself from the nurses' negligence because it is only vicariously liable, the result would be that any corporation could always be in a position to secure indemnity from an individual who was, at the time of any negligence committed, a joint tortfeasor with its servant, since a corporation can act only through a servant.[4] Were the hospital seeking indemnity from its nurses, its vicarious liability would be of vital importance. The hospital is not entitled to indemnity from the surgeon.

The judgment of the trial court directing a verdict for indemnity in favor of the surgeon is reversed and the case is remanded.[5]

[4] *See* Restatement of the Law of Restitution § 87.
[5] No issue of statutory contribution between joint tortfeasors has been raised in this case. See ORS 18.440.