Argued July 12, affirmed December 19, 1978

SIMPSON, *Respondent,*
*v.*
SISTERS OF CHARITY OF PROVIDENCE
IN OREGON, *Appellant.*
(No. 410-399, SC 25128)
588 P2d 4

[ 548-a ]

Edwin J. Peterson, Portland, argued the cause for appellant. With him on the briefs were Charles R. Holloway, III, and Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

Richard P. Noble and R. Ladd Lonnquist, Portland, argued the cause and filed a brief for respondent.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent, and Linde, Justices.

BRYSON, J.

**BRYSON, J.**

Plaintiff brought this action against defendant hospital to recover for personal injuries suffered, alleging the hospital staff negligently failed to take adequate x-rays of plaintiff's cervical and thoracic spine. The jury returned a verdict in favor of plaintiff. Defendant appeals from the judgment entered on the verdict.

■ Defendant's first two assignments of error are the trial court's denial of its motions for a nonsuit and a directed verdict. When determining the propriety of such motions we view the evidence in a light most favorable to the plaintiff, and plaintiff is entitled to the benefit of all reasonable inferences that may be drawn from the evidence. *Hendrix v. McKee,* 281 Or 123, 126, 575 P2d 134 (1978).

We examine the evidence to determine if there is competent evidence, both as to causation and negligence, from which the jury could reach a verdict in favor of plaintiff.

Plaintiff built custom homes and was 60 years old on July 5, 1973, the time of his injury and the beginning of treatment. While working on a job he fell six feet off a scaffold, landing on his neck and shoulders. He was taken by ambulance to defendant hospital's emergency room. The physician on duty at the emergency room ordered x-rays of "[b]oth wrists, both forearms, AP chest, thoracic spine, cervical spine and skull." Several technicians began taking x-rays of plaintiff at 12:30 p.m. The technicians tried to obtain a picture of plaintiff's cervicothoracic junction, the point at which the cervical and thoracic portions of the spine join, by a cervical lateral film and six or seven "swimmer's views." The technicians changed their technique on approach from film to film in order to get a clear picture. The plaintiff's position on a stretcher and his pre-existing condition of rheumatoid spondilitis, which caused his head to tilt down and to the

left side, made it difficult to obtain clear pictures. As a result, no clear x-rays of the junction were obtained. Nevertheless, there was evidence that without moving plaintiff and by making minor adjustments to the x-ray equipment, the technicians could have obtained a clear view of the junction. In fact, x-rays taken at a later date showed the cervical thoracic junction adequately for diagnostic purposes.

There is evidence that the plaintiff's physicians, after numerous x-rays, believed that the x-rays taken were the best that could be obtained under the circumstances and so the taking of x-rays was discontinued at 2:20 p.m. on July 5. One of plaintiff's physicians decided to order another x-ray of the cervical thoracic junction the next day, July 6, but this order was countermanded by another of plaintiff's physicians, Dr. Watson, a neurologist. Dr. Watson gave no reason for his action; however, there is evidence from which the jury could reasonably have inferred that Dr. Watson felt that the best possible x-rays had been taken and there was no point in moving plaintiff in an attempt to take further x-rays.

Plaintiff was immobilized from the time he arrived at the hospital. There is evidence that this strict immobilization could impair plaintiff's pulmonary function. In fact, plaintiff later suffered from lung congestion. For this reason, on July 8 Dr. Watson ordered plaintiff "dangled," meaning plaintiff sat on the bed with his legs dangled over the side. Dr. Watson was not concerned about a possible fracture in plaintiff's spine at the cervical thoracic junction. He testified:

"Q Were you concerned then in any way about a possible fracture in the C-7/T-1 area?

"A Well, not per se. The clinical symptoms didn't point to that. The clinical symptoms that he had would have pointed to a lesion, as I said, somewhere from about D-10 centrally towards the skull and could have been anywhere from there on up. We did not see, as everyone

[ 550 ]

I'm sure has heard endlessly, the entirety of his cervical-thoracic spine on x-ray to our satisfaction in that first set of several days of x-rays. But there was no more reason to suspect a lesion there than there might have been in other areas, no more clinical reason, excuse me."

Nevertheless, plaintiff had a fracture at the cervical thoracic junction resulting from the fall and when he was dangled the fracture compressed the spinal cord, paralyzing plaintiff from the shoulders down.

Plaintiff brought this action against his physicians and defendant hospital. He settled his action against the physicians for $150,000, leaving only the hospital as defendant.

Under defendant's first two assignments of error, the trial court's failure to allow defendant's motions for nonsuit and a directed verdict, defendant makes three separate arguments: (a) the defendant's x-ray technicians were not negligent because they were following doctors' orders; (b) the x-ray technicians were under the supervision and control of the treating physicians; and (c) "there is no causation in fact between the failure to take films showing the fracture on the 5th, and the ambulation on the 8th."

(a) The evidence shows that following plaintiff's admittance at the emergency room, plaintiff was taken to the x-ray department with orders to take x-rays of the thoracic and cervical spine. A chief x-ray technician and an assistant technician are in charge of the x-ray technicians in that department. All such technicians are defendant's employees. In taking x-rays, the technicians follow instructions from the hospital's booklet,[1] which was received in evidence, showing the procedure to be followed for taking x-rays ordered, including "cervical spine — trauma acute" and "thoracic spine." This is undoubtedly a text familiar to x-ray technicians and radiologists on the

---

[1] Booklet published for the hospital's x-ray department has reference to "Merrill, Volume I, pp 218-237" and "Merrill, Volume I, pp 238-245."

procedure for taking x-ray films. This was the procedure followed by the hospital in this case. The x-ray technicians are certified by a National Board after training and study in anatomy and physiology, radiographic positioning, x-ray physics, darkroom chemistry, nursing procedures, and terminology. A certain grade point must be achieved on examination "to be certified technicians or registered technicians."

The hospital administrator, Dr. Lee, testified that the technicians take the x-ray films per prescription or order. He testified:

"A * * * [A]ll x-rays are done on a physician's order. And normally, this is an order like a prescription issued by a physician on our Medical Staff. The patient comes in and says, 'I need an x-ray,' and they usually have a prescription for it. * * * [T]he picture is then taken and the film interpreted by the radiologist [M.D.] that is on duty. Occasionally, he may decide that another film is in order, whatever. Most of the time when this is done, he will get hold of the attending physician and consult with him to verify that indeed additional or supplemental films need to be taken."

There is no radiologist in the x-ray room while the x-ray technicians are performing their duties, and normally the radiologist does not see or consult with the patient.

Dr. Watson testified:

"Q You don't give them specific instructions about how many milliamps to deliver?

"A No, sir. I wouldn't know how.

"Q Or whether they should use a grid?

"A Um, I'm familiar enough with the techniques of what you can get with and without a grid, but I would never attempt to offer that advice to them [the x-ray technicians].

"Q And you did not in this case?

"A Not to my recollection. * * *.

"* * * * *.

"A Um, well, in fact, to be precise, none of them [radiologists] were in the room when the x-rays were

being taken because I don't stay in the room when the x-ray is being done. * * *."

■ There is, of course, some evidence to the contrary but the preponderance of evidence is to the effect that the hospital's employees, the technicians, were not under doctors' orders as to technique in taking and developing x-ray films. The jury could believe the evidence that showed the x-ray technicians to be negligent in failing to obtain a clear film of the cervical thoracic junction and that the technicians were not following the physicians' orders as to technique.

(b) Much of the above testimony, together with other evidence in the record, was sufficient to allow the jury to find that the x-ray technicians were not under the supervision and control of the treating physicians when performing their duty of taking and developing x-ray films of plaintiff's cervical thoracic junction of the C7/T-1 area.

Intertwined with this argument and that made in argument (a), the defendant asserts the so-called "Captain of the Ship" rule to the effect that "hospitals' support personnel are obligated to carry out the orders of doctors, and so long as the order is carried out in a competent manner, hospital personnel are not negligent." (Citing *Dumer v. St. Michael's Hospital,* 69 Wis 2d 766, 233 NW2d 372 (1975); *Stogsdill v. Manor Convalescent Home, Inc.,* 35 Ill App 3d 634, 343 NE 2d 589, 612 (1976); *Mesedahl v. St. Luke's Hospital Ass'n of Duluth,* 194 Minn 198, 259 NW 819, 822 (1935), and cases from other jurisdictions.)

■ Oregon has not expressly adopted such a rule and the facts of this case do not require that we do so because said rule only excuses hospital personnel who carry out physicians' orders in a competent manner. The jury in this case could have found from the evidence that the orders were not carried out in a competent manner. The jury could have found that the technicians took the requested x-rays in a negligent

manner, leading to the physicians' eventual decision to stop taking x-rays. We do not understand the "Captain of the Ship" rule to insulate hospitals or their employees from liability for following orders in a negligent manner.

In *Piehl v. The Dalles General Hospital,* 280 Or 613, 571 P2d 149 (1977), a case in which a piece of material known as a laparotomy sponge was left in plaintiff's abdomen, we stated, at 619-20:

"* * * There is no doubt that the nurses were regular employees of the hospital and that they were negligent. * * *

"The hospital can act only through its employees. It furnished services to plaintiff through the work of the nurses for which it was being paid by plaintiff. It owed a duty to plaintiff not to perform these services negligently. That duty was breached when the nurses miscounted the sponges. There was no disproportion in the character of the duty owed to plaintiff by each defendant. The gravity of the fault of the nurses was as great as any fault that could have been committed by the surgeon. Therefore, there is no basis for indemnity to the hospital. Regardless of whether or not the nurses were the loaned servants of the surgeon for some purposes, they remained servants of the hospital in carrying out the work for which it was being paid by plaintiff."

In the case at bar the evidence shows that the hospital and the radiologist each billed the patient separately for their services.

In *May v. Broun,* 261 Or 28, 36-37, 492 P2d 776 (1972), we stated:

"We start out with the nurse being an employee of the hospital which selects, trains and pays her. * * *.

"*Respondeat superior* is usually determined by the right of the claimed principal to control the negligent actor. There is no doubt that a surgeon has the right to control the employees of the hospital, including the nurse, in the preparation of the hospital room and of the patient for surgery, as well as in the carrying out of their functions during surgery. However, in a situation where

the nurse is in the general employ of the hospital and is performing services for the hospital as well as for the surgeon, courts do not now usually hold that she changes from a general employee of the hospital to a special employee of the surgeon until she is under the surgeon's direct supervision or control. * * *" (Citations omitted.)

*See also Penrose v. Mitchell Bros.,* 246 Or 507, 512, 426 P2d 861 (1967). Thus, under both the facts of this case and the law of Oregon, we conclude that the defendant was not entitled to a directed verdict pursuant to its argument (b).

■ (c) Defendant argues there is no causation in fact between the failure to take films showing the fracture on the 5th and the ambulation on the 8th because there is no evidence that had films been taken on July 5th showing a fracture of the C7/T-1, the ambulation and resultant injury would not have occurred on July 8. The issue raised is really whether the negligent conduct of the defendant, as alleged by the plaintiff, was a substantial factor in producing plaintiff's injury.[2] The causation question in a negligence action such as this is usually one of fact. The terms "proximate cause" and "legal cause," as used in defendant's brief, are usually misleading and should be avoided. *See Stewart v. Jefferson Plywood Co.,* 255 Or 603, 606, 469 P2d 783 (1970); *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 463, 415 P2d 735 (1966). The terms "proximate cause" and "legal cause" suggest that policy decisions have something to do with actual cause, which is not the case. Therefore, we conclude it is time to abandon those terms. In *McEwen v. Ortho Pharmaceutical,* 270 Or 375, 385 note 7, 528 P2d 522 (1974), we stated:

" 'Causation in fact' is unrelated to 'proximate' or 'legal' cause, concepts which have been discarded by this court. * * *." (Citations omitted.)

[2]The substantial factor formula is discussed in *McEwen v. Ortho Pharmaceutical,* 270 Or 375, 385, 528 P2d 522 (1974); *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 606, 469 P2d 783 (1970); *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 463, 415 P2d 735 (1966); and *Dewey v. A. F. Klaveness & Co.,* 233 Or 515, 541, 379 P2d 560 (1963).

■ In the case at bar we conclude there is competent evidence from which the jury could have found that the x-ray technicians', defendant's employees, failure to take x-rays showing the cervical thoracic junction was an actual cause of plaintiff's injury. The jury could have found that the x-ray technicians could have taken a picture of the crack in the junction in their original series of x-rays. Indeed, subsequent x-rays taken showed the crack in that junction. The jury could further have found from the evidence that if the doctors had received a proper x-ray of the critical junction they would not have ambulated plaintiff but, instead, would have rigidly immobilized him. There is testimony from Dr. Watson, Dr. Smith, and Dr. Leland Cross on this point. Dr. Cross testified:

> "Q How about when you have clinical findings consistent with a fracture of the cervicodorsal spine?
> "A It should be suspected, but one would need adequate films to prove it.
> "* * * * *.
> "Q And Dr. Cross, although there were a number of symptoms present which Mr. Holloway has asked you about, what is the basis for making the diagnosis of the fracture-dislocation of the cervical thoracic spine?
> "A It would be required to have a film that would demonstrate the fracture sufficiently so you could identify it.
> "Q And do any of these films do that?
> "A Not on that last board that I was looking at, no sir.
> "Q Do any of the films taken the first day do that?
> "A None that I have seen, sir."

Dr. Donald Smith testified:

> "Q How is the diagnosis of a fracture of the spine made, doctor?
> "A Well, the old classic statement is you have to have a high index of suspicion, and you certainly have to be a little bit fearful of that as an aftermath of any significant injury to the neck-head area. And the use of early x-ray examinations, of course, is the basis for most diagnoses. * * *"

The jury could have found from the testimony as a whole, including the above testimony, that the x-ray technicians' failure to take an adequate x-ray of the fractured area was an actual cause of plaintiff's injury.

■■ Defendant argues that plaintiff failed to establish either lack of due care or foreseeability and there was no evidence of negligence on the part of the technicians. Our review is limited to the question of whether the jury could have reasonably found from the evidence that the technicians were negligent. The jury, in assessing negligence, must decide "whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community." *Stewart v. Jefferson Plywood,* 255 Or 603, 607, 469 P2d 783 (1970). The trial court should direct a verdict in favor of defendant in this case only if it can be said "that the actor's conduct clearly meets the standard * * *." *Stewart v. Jefferson Plywood, supra.*

Defendant concedes that the technicians could have taken x-rays showing the fracture at the time they took the original series of x-rays but it argues that mere failure to take an x-ray that could have been taken does not necessarily show lack of due care.

■ There is evidence in this case that the registered and licensed technicians, defendant's employees, did possess the knowledge and skill necessary to detect whether they had produced x-rays of the cervical thoracic junction pursuant to the physicians' orders. Further, not every case of malpractice requires direct medical testimony on the issue of the applicable standard of care and whether that standard was met. "[I]f the jury is capable of deciding what is reasonable conduct without assistance from an expert medical witness no expert testimony is necessary to establish the standard of care." *Getchell v. Mansfield,* 260 Or 174, 179-80, 489 P2d 953 (1971); *cf. Lynd v. Rockwell Manufacturing,* 276 Or 341, 349, 554 P2d 1000 (1976) (stating the general rule for when testimony of experts

on technical matters is not essential). In this case, there was evidence that the x-ray technicians could have taken the necessary photograph had they made certain minor adjustments in the position of the film and the intensity of the x-ray beam and that they could have taken the picture without moving the plaintiff. There was evidence that after plaintiff had been paralyzed, the technicians were able to obtain clear views of his cervicothoracic junction without any difficulty.

The physicians ordered the x-rays stopped after two hours. The defendant apparently argues from this that the physicians should have allowed the technicians to continue taking pictures until they managed to produce a clear one. This argument ignores the probability that at some point the physicians could conclude, as the evidence shows they did, that the best possible pictures had been taken. The jury could have found from the evidence that for x-ray technicians to meet the standard of care expected of them, it is not enough for them to take a series of bad pictures hoping to obtain a good one.[3] From the evidence, it is quite foreseeable that after the x-ray technicians failed to get a clear x-ray in a reasonable time, the physicians would not and did not order more x-rays on July 5 and that they would ambulate plaintiff to avoid plaintiff's pulmonary problems they were concerned with. The trial court concluded from all of the evidence that it was a jury question as to whether the x-ray technicians were or were not negligent in producing the

---

[3] This is not to say that anytime an x-ray technician upon a physician's request takes films of a portion of a person's body that the technician guarantees, upon the pain of being held to be negligent, that the resultant film will show all defects necessary to a proper diagnosis. It is the radiologist who reads the film and who decides whether it is sufficient to enable a diagnosis of the area about which there is concern. While a technician is supposed to be skilled in the taking of x-rays, he is not an expert in deciding whether they are sufficient for the purpose of a specific diagnosis. Therefore, had there been only one set of x-rays taken of the plaintiff when he was admitted and had those x-rays been satisfactory to and accepted by the radiologist and the treating physicians, who were not employees of the hospital, we would hold there was no basis for a jury to find that the technicians were negligent.

[ 558 ]

faulty x-rays and that such was one of the causes of plaintiff's injuries. In *James v. Carnation Co.,* 278 Or 65, 69, 562 P2d 1192 (1977), we stated:

> "[A] nonsuit or directed verdict should be entered only in exceptional cases where, from the facts, reasonable men could draw but one inference and that inference supporting the conclusion that defendants were not negligent; or that defendants' negligence was not the factual * * * cause of plaintiff's injury. *Law v. Kemp,* 276 Or 581, 556 P2d 109 (1976); *Oregon Auto. Ins. Co. v. Fitzwater,* 271 Or 249, 259, 531 P2d 894 (1975); *Carlson v. The May Dept. Stores,* 270 Or 289, 292, 527 P2d 252 (1974); *Cutsforth v. Kinzua Corp.,* 267 Or 423, 432, 517 P2d 640 (1973); *Skeeters v. Skeeters,* 237 Or 204, 214, 389 P2d 313, 391 P2d 386 (1964); *Eitel v. Times, Inc.,* 221 Or 585, 592-95, 352 P2d 485 (1960); *Ellenberger v. Fremont Land Co.,* 165 Or 375, 385-86, 107 P2d 837 (1940). * * *."

We conclude that the trial court did not err in denying defendant's motions for a nonsuit and a directed verdict.

■ Defendant's third assignment of error is the court's instructing the jury as follows:

> "* * * An act or omission is a cause of damage when in a direct and unbroken sequence it produces the damage. Another way of saying it is that negligence or an act or omission is a cause of damage if it is a substantial factor in producing the damage.* * *."

Defendant excepted as follows:

> "Second, we except to the Court's instruction on the — the Court gave the instruction on proximate cause, and then the Court added that proximate cause is that cause which — 'is a substantial factor in producing the damage.' I realize there is a host of cases to that effect, but it is my belief, Your Honor, that that language is entirely meaningless to the jury and permits the jury to, in effect, find causation absent causation, in fact."

Defendant's brief admits "[w]e have found no Oregon cases questioning the instruction given by the trial judge" and then relies upon *McDowell v. Davis,* 104 Ariz 69, 448 P2d 869 (1969).

First, we have examined the trial court's instructions in regard to causation and no mention was made of "proximate cause." Defendant objected to the substantial factor language in the given instruction, arguing "that language is entirely meaningless to the jury." We disagree. We have approved the use of the substantial factor formula in numerous cases.[4] We see no reason to abandon our prior ruling and we are not aware of a better formula. Thus, we agree with Prosser that "[a]s applied to the fact of causation alone, no better test has been devised." W. Prosser, Law of Torts 240, § 41 (4th ed 1971). We find no error in this assignment.

The fourth assignment of error is the court's refusal to give defendant's requested instruction No. 21A:

"Plaintiff must also prove that the hospital's negligence was the proximate cause of his injuries. The plaintiff must prove the following:

"1. That the defendant hospital failed to take adequate x-rays of the plaintiff's cervical and dorsal spine on July 5, 1973;

"2. That plaintiff's injuries would have been avoided had the x-rays which plaintiff claims should have been taken, been taken."

The requested instruction uses the term "proximate cause," which we have found misleading and have abandoned. Further, the trial court did give instructions which, on the whole, covered the issue which allowed the jury to properly consider the matter. The term "proximate cause" is not the same as actual cause. Because the requested instruction contained objectionable language, it was properly rejected by the court. *Owings v. Rose,* 262 Or 247, 258, 497 P2d 1183, 57 ALR3d 821 (1972).

Defendant's fifth assignment of error, the court's refusal to give defendant's requested instruction No. 21B, argues that the "but for" test of causation incorporated in the instruction would have been more appropriate in this case than was the substantial

---

[4] *See* cases cited in note 2, *supra.*

factor test because the allegation of negligence in this case was the negligent failure to do something rather than the negligent doing of something. In making this argument, defendant assumes that the substantial factor formula would allow the jury to find that a defendant's conduct was a substantial factor in producing injury, even though the jury felt that the injury would have occurred anyway. We do not agree with this assumption; instead, we agree with Prosser's comment on the relationship between the substantial factor test and the "but for" test:

> "[The substantial factor formula] is clearly an improvement over the 'but for' rule. It disposes of the cases mentioned above, and likewise of the difficulties presented by two other types of situations which have proved troublesome. * * * But in the great majority of cases, it amounts to the same thing. Except as indicated, no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it; nor will cases very often arise where it would not be such a factor when it was so indispensable a cause that without it the result would not have followed." W. Prosser, Law of Torts 240, § 41 (4th ed 1971). (Footnotes omitted.)

Although the term "substantial factor" is concededly not perfect, it and the instructions as a whole were sufficient to alert the jury that to find actual cause in this case they must find that the injury would not have occurred had the technicians taken proper x-rays. The instructions as given adequately presented the issue to the jury, and the trial court did not err in refusing to give the requested instruction No. 21B. *Barrell v. Brown*, 261 Or 463, 472, 495 P2d 733 (1972).

Defendant next argues that the trial court erred in refusing to give the following requested instruction:

> "The law provides certain disputable presumptions which (may) apply to the plaintiff's claims against the hospital in this case.
>
> "The disputable presumptions that apply to this case are these:

[ 561 ]

"1. The hospital is free from negligence [ORS 41.360(1)].

"2. The ordinary course of business has been followed [ORS 41.360(20)].

"Disputable presumptions, if found by you to apply, are to be considered by you as evidence along with the other evidence in this case. A presumption is a deduction which the law directs to be made from particular facts. If there is no evidence opposing a disputable presumption, you are required to accept the presumption as true.

"Since these presumptions are disputable presumptions and are only generalizations concerning human conduct, they may, in the light of other evidence, not be controlling.

"If there is evidence opposing a disputable presumption you should give the presumption such weight as you deem best. In that case, beyond its own weight as evidence, the presumption has no special force which must influence your deliberations. Upon the whole evidence, you must determine whether the point upon which the presumption bears has been proven by the greater weight of the evidence. If you are unable to decide the point, decide it against the party having the burden of proof on that point."

■ Parties are entitled to instructions on the existence and effect of presumptions. *Wiebe v. Seely, Administrator,* 215 Or 331, 359, 335 P2d 379 (1959); *Wyckoff v. Mutual Life Ins. Co.,* 173 Or 592, 603, 147 P2d 227 (1944). However, in the context of this case it appears parts "1" and "2" of the requested instruction simply amount to the presumption that a party is presumed to be free of negligence. The trial court did instruct:

"* * * First of all, the law presumes that all persons have obeyed the law and have been free from negligence. * * *."

The court also instructed on another issue that a disputable presumption "may be overcome. Whether it is overcome is a matter for your determination." The "ordinary course of business" presumption, which is really intended to apply to business activities, would apply to this case, if at all, only to refute negligence.

[ 562 ]

Frankly, we doubt if the entire instruction would or could be understood by the jury and, although jurors are to follow the court's instructions, the instruction as a whole would be confusing.

The court's instructions were sufficient to communicate the substance of the requested instruction to the jury and we conclude the trial court did not err in refusing to give the requested instruction.

Defendant's seventh assignment of error contends the court erred in failing to give the following requested instruction:

"REQUESTED INSTRUCTION NO. 24

"Depositions of various persons have been read at various times during the trial. I shall now instruct you on certain rules relating to such deposition testimony:

"1. The deposition of any person who is out of the state is to be given the same weight as if the person whose testimony is being taken were appearing personally;

"2. The deposition of a party has the same weight as any other testimony of that party;

"3. When a deposition is used to contradict the testimony of a witness in court who is not a party, the deposition testimony cannot be considered as evidence of the facts stated therein, but solely to discredit the witness."

Part three of the requested instruction not given raises the point argued by defendant; that is, "[i]mpeachment by deposition is not substantive evidence."

The problem arose during trial in the following manner. Mr. Massey, one of defendant's witnesses and one of the technologists that took x-rays of plaintiff on July 5, testified extensively on the procedure followed in the taking of x-rays of plaintiff on July 5. He also testified that Doctors Jang and Watson reviewed the x-rays after they were taken. Defendant's brief argues that

"* * * on cross-examination plaintiff's attorney read from Mr. Massey's deposition where he had said that he,

Massey, did not know whether Dr. Jang and Dr. Watson consulted while the plaintiff was in the x-ray room and did not recall whether he had seen the two together on the date of admission."

The cross-examination by plaintiff's attorney based on Massey's deposition occurred as follows:

"Q When your deposition was taken, again, Mr. Massey — page 30, counsel, line 14:

" 'Q. Did Dr. Jang ever examine Mr. Simpson to your knowledge?'

" 'A. No.'

" 'Q. Do you know whether or not Dr. Jang ever consulted with Dr. Watson while Mr. Simpson was in the x-ray room?'

" 'A. I don't know for sure.'

" 'Q. Did you see them together at any time?'

" 'A. I can't recall.' "

█ The first question we have to consider is whether or not the above testimony by deposition was impeachment or substantive evidence. To "impeach" a witness is "to attack or discredit the witness and to attack the jury's belief in his or her testimony." *State v. Gilbert,* 282 Or 309, 311, 577 P2d 939 (1978). See also McCormick, Evidence § 33 (2d ed 1972). Dr. Jang was a radiologist (physician) on duty at the hospital from time to time and examined or read the x-rays taken by defendant's x-ray department. Dr. Watson was a neurologist present at the hospital when plaintiff was brought there and became plaintiff's physician.

█ It appears from the record that the questioning via Mr. Massey's deposition on cross-examination was impeachment of witness Massey's testimony and that it was not offered as substantive evidence.

We further point out that both defendant's counsel and plaintiff's counsel used the deposition of Mr. Massey while he was testifying and both counsel read from the deposition. When the testimony complained of was elicited by plaintiff's counsel from Mr. Massey's deposition, no objection was made and no request was

made that the jury be instructed to consider the testimony only as impeachment and not as substantive evidence.

Part 3 of the requested instruction not given should either have specified the testimony to which it applied or, preferably, the point should have been raised at the time the deposition testimony was read.

For all of the above reasons, we conclude that the court did not err in refusing to give defendant's requested instruction No. 24.

Defendant's assignments of error eight, nine and ten (which are related to defendant's assignments of error 11, 12, and 13) concern the testimony of plaintiff's witness, Charles Jerabek, an employee of defendant. Plaintiff was offering evidence to establish the cost of nursing care of plaintiff in the future as an element of damages.

Jerabek testified:

"Q * * * [W]ere you requested to bring certain information with you that relates to salary schedules for nurses' aides?
"A Yes.
"* * * * *.

"Q And are you familiar with the general types of duties that are performed by such an employee?
"A Yes, I am.
"* * * * *.

"Q Would they do such things as bowel programs or catheter care, bathing, dressing, things of that sort?
"A Yes, they do.

"Q Are you familiar with the salary scale — what you are required to pay such an employee?
"A Yes, I am.
"* * * * *.

"Q * * * What is the salary range for nurses' aides?
"A It is at base $3.40 an hour. And it increases at six months to $3.65 an hour; one year at $3.82 an hour; two

years at $3.99 an hour; three years at $4.16 an hour, and four years at $4.33 an hour."

■ Defendant's objection was "on the grounds of relevancy, competancy [sic] and materiality." A general objection on the basis of relevancy, competency, and materiality, "if overruled, cannot avail the objector on appeal." (Citations omitted.) *Smith v. Oregon Agricultural Truck.,* 272 Or 156, 160, 535 P2d 1371 (1975). Of course there are exceptions to this rule but they are not applicable from the record in this case. McCormick, Evidence (2d ed) 115-16, § 52.

However, when plaintiff rested defendant made the following motion:

"[Counsel for defendant]: Now, if the Court please, the plaintiff having rested, we have some specific motions. First, we move to strike the testimony of the witness Jerabek, the St. Vincent Hospital man who was called to lay the foundation for the cost of home nursing care on the ground that * * * contrary to the statement of Mr. Noble at the time, the testimony was received. It has not been connected and, therefore, there is no foundation for that testimony to be received in evidence. * * *

"THE COURT: Well, the motion to strike Jerabek's testimony will be denied."

We conclude from this motion and the entire record that the issues raised by these assignments are properly before the court.

■ It is true that Jerabek was testifying as to what it would cost a hospital in the community to provide plaintiff, paralyzed from the shoulders down, with nursing aide services in the future; however, plaintiff's next witness, called as an expert, was Dr. Russell Dawson, an economist. His qualifications are discussed in defendant's next assignment of error. Dr. Dawson testified that the sum of $3.91 per hour on an 8-hour day basis was a reasonable rate of pay for nurses' aides for in-home care. Dr. Dawson testified he made a study to arrive at the $3.91 per hour basis,

which included inquiries from Homemakers-Upjohn, Pathmakers, an employment service, and Medical Personnel Pool of Portland. He testified:

"Q Do these agencies provide nurses aide services or in-home care as well as hospital care?

"A Yes, they do."

He testified that such services for in-home care were $5 to $4.25 per hour, "it [$3.91 per hour] is reasonable and I think probably conservative."

Although witness Jerabek's testimony had less specific probative value on the question of future costs than evidence of the salary rate of a nurse whose task was to care for a person in plaintiff's position, nevertheless, it was relevant and had some probative value and was merely cumulative to the evidence of Dr. Dawson. McCormick, Evidence §§ 183, 184 (2d ed 1972). If there was error, as contended by defendant, it certainly was not reversible error for the court to allow the testimony.

▇ Defendant's assignments of error 11, 12, and 13 concern the testimony of plaintiff's witness, Dr. Dawson, an economist. The homogenized gist of defendant's numerous objections to portions of Dr. Dawson's testimony is that the economist testified regarding matters that did not require an expert's opinion or testimony. The court had sustained defendant's objections to some of the questions put to Dr. Dawson and denied others. For instance, plaintiff had offered a series of charts, exhibits 89 through 94, prepared by Dr. Dawson, to show damages suffered by plaintiff as a result of his injuries. The trial court returned to the courtroom from arguments in chambers and stated:

"THE COURT: The Court has sustained the objection to the exhibits which were offered, which I believe were Numbers 89 through 94, but has ruled that this witness may use them to illustrate his testimony to you."

During colloquy between court and counsel the following occurred:

"[THE COURT]: On the other side of the coin [to defendant's counsel], looking at it my way, I would not understand why a lawyer could not use these [exhibits] in his final argument.

"[Defendant's counsel]: Granted.

"* * * * *.

"[Defendant's counsel]: * * * I have no objection if he wants to use those tabulations in his argument to the jury."

The following also occurred:

"[Defendant's counsel]: Well, Your Honor, I think in the first place, that is something that is uniquely within the province of the jury, No. 1.

"THE COURT: If I could ask a question so I understand? When you say that you are challenging the right to even call an economist —

"[Defendant's counsel]: Right.

"THE COURT: Of course, that has been done many times.

"[Defendant's counsel]: That has been done many times, but the Supreme Court of Oregon has never approved the practice.

"THE COURT: Now, I would overrule any objection of that kind.

"[Defendant's counsel]: I might say that the basis for that objection is that the testimony invades the province of the jury. * * *

There is no question about Dr. Dawson's qualifications. He received a degree of Doctor of Philosophy and Economics from the University of California at Berkeley. He was a professor of economics at the University of Maryland and at Portland State University. In addition, he worked as a research economist and consultant for other companies. The defendant argues that he should not have been allowed to testify as he did on the amount of plaintiff's damages in that an expert's opinion and testimony was not required.

In *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 486 P2d 553 (1971), we reviewed the earlier opinions of this court regarding the use of an expert's testimony and in

both the majority opinion, at page 258, and the dissenting opinion, at page 263, we stated the following rule from 7 Wigmore, Evidence 21, § 1923 (3d ed 1940) with approval:

" 'But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject * * *.' " (Emphasis in text.)

*See also* McCormick, *Opinion Evidence in Iowa,* 19 Drake L Rev 245, 257 (1970).

We conclude, as did the trial court, that Dr. Dawson's testimony on this subject was of appreciable help to the jury and therefore the trial court did not err.

Defendant's fourteenth and last assignment of error is that the trial court erred in giving the following instruction:

"According to the evidence in this case, the mortality table, the life expectancy of a man who is 64 years old is 13.7 years. This fact should be considered by you in arriving at the amount of damages, general damages, that is, if you find that the plaintiff is entitled to a verdict. Life expectancy, however, as shown by the tables is, as you probably know, only an estimate of the probable average length of life of people at a given age in our country. It doesn't say that everyone is going to necessarily live only to that year. It may be longer; it may be shorter. So you should consider that evidence along with the other evidence bearing on the plaintiff's life expectancy, such as his sex, his health, his habits and his activities."

The defendant excepted as follows:

"[Defendant's counsel]: Your Honor, I do except to the instruction on standard mortality on the grounds that when you tell the jury this fact should be considered by you, you are, in effect, telling them then that they must consider it. And I submit the proper instruction on the mortality table should be that the jury may consider the mortality tables."

[ 569 ]

Defendant argues that the word "should" in the instruction was misleading and that the court should have used the word "may." We agree with defendant that the use of the word "may" would have been preferable. Where there is substantial evidence of permanent injury, the standard mortality tables may become admissible, at least if earning power is permanently impaired. *Zimmerman v. Ausland,* 266 Or 427, 431 n 3, 513 P2d 1167 (1973). In the case at bar, defendant did not object to the giving of the instruction as a whole but only to the use of the word "should." We take the instruction as a whole, and the court told the jury such tables were only an estimate of the probable average length of life of people at a given age in our country. He also stated, "it may be longer; it may be shorter," and they should consider that evidence along with other evidence bearing on the subject. We conclude that the instruction as given under the circumstances of this case was not reversible error.

Affirmed.