Argued May 29, reversed and remanded August 20,
reconsideration denied September 25,
petition for review denied December 11, 1979

# CRIQUI,
## *Respondent,*
### *v.*
# PEARL MUSIC COMPANY, INC., et al,
## *Appellants.*
### (No. A7610, 15153 CA 12228)
599 P2d 1177

Edward H. Warren, Portland, argued the cause for appellants. With him on the brief were Lauren M. Underwood, and Acker, Underwood, Beers, Smith & Warren, Portland.

Richard D. Senders, Portland, argued the cause for respondent. With him on the brief was Rose and Senders, Portland.

Before Schwab, Chief Judge, and Thornton, Buttler* and Joseph, Judges.

JOSEPH, J,

_____
*Buttler, J., did not participate in this decision.

**JOSEPH, J.**

This is a fraud action. The jury returned verdicts in favor of plaintiff and against each of the defendants in the sum of $18,321 compensatory damages and $40,000 punitive damages. Defendants Pearl Music and Martin appeal. We review the evidence most favorably to the plaintiff.

Pearl Music, which also does business as the Tape Company and as National Music Company, is a California corporation in the business of selling "music packages." Martin is its president and sole shareholder. Each package consists of stereo cassette playing equipment, 100 coupons for pre-recorded cassettes, a cassette catalog and discount coupons for blank tapes. The packages are sold on a three-year financing plan through a few regional "master dealers" and local dealers in turn recruited by them. All dealers are strongly encouraged to use a standard sales approach. The master dealer receives $50 to $100 for each package sold to a local dealer in his region.

Charles Zimmerman was the master dealer for the Northwest United States.[1] In early 1976, he established a Portland distributorship, which began to do business as Pacific Sound and Music (Pacific). Pearl Music arranged the start-up financing for Pacific.

In April, 1976, plaintiff placed an ad in the newspaper stating that he had several thousand dollars to invest and that anyone with a good idea should contact him. Zimmerman did, and he eventually persuaded plaintiff to purchase the local distributorship. During the negotiations, Zimmerman made various representations to plaintiff. Plaintiff originally alleged that several of the representations were fraudulent. He abandoned some of those allegations at trial and relied only on the representations that:

"The marketing program, which was designed by defendants and which was used to sell packages of tapes and playing equipment, was legal.

[1] Zimmerman defaulted below and has not appealed.

[513]

"Defendants had the right to duplicate the most recent sound recordings produced by record companies.

"Defendants' business of duplicating sound recordings was legal."

Plaintiff did not have any contact with Martin prior to purchasing the dealership. Subsequently, however, he did speak with Martin, who told him, as Zimmerman had, that Pearl Music paid royalties and could duplicate any recording. There was evidence from which the jury could have found that the representations were made and that they were false.

Plaintiff purchased some of the music packages from Pearl and attempted to sell them. He became increasingly troubled about various aspects of the business. In August, 1976, he ceased doing business. During the four months he was in business, he had a $7,221 net operating loss. He testified that he quit because "the business that I wound up with was simply not the business that I purchased, that I thought I was purchasing." He did not find out that certain aspects of the business were probably illegal until after he had closed down.

■ Defendants first argue that there was no basis for imposing vicarious liability on Pearl or Martin because there was no evidence from which the jury could find that Zimmerman was acting as defendants' agent when he made the representations. We do not agree.[2] The evidence was adequate to prove that as a "master dealer" Zimmerman was acting for defendants and was encouraged and instructed by them to set up local dealerships. They may not have directly controlled the particular manner in which master dealers set up local operations, but they did retain the right to refuse to sell to any local dealer of whom it did not approve. Although there was no evidence that Zimmerman was

---

[2] We note that the theory of ratification, discussed below, constituted an independent basis for liability. The judgments could therefore be affirmed even if there were no evidence to establish vicarious liability.

specifically authorized to make the alleged representations, the subject matters of those representations were of the sort which could reasonably be expected to be made selling a local dealership. Defendants were therefore subject to liability. *Barnes v. Eastern & Western Lbr. Co.*, 205 Or 553, 287 P2d 929 (1955); Restatement 2d Agency § 258 (1958).

■ ■ Defendants next contend that the alleged representations as to legality were matters of opinion, not fact, and could not be the basis of a fraud action. The law no longer precludes actions based on fraudulent representations as to the law. Whether such a misrepresentation is actionable depends on the circumstances under which it is made and is a question for the trier of fact. *Peterson v. Auvel*, 275 Or 633, 552 P2d 538 (1976). Furthermore, in this case the representations were not all simply that a particular aspect of the business was "legal." Both Zimmerman and Martin told plaintiff that Pearl Music paid royalties, and the clear implication was that the right to duplicate recordings was based on such payments. That was an expression of fact.

■ Defendants also assign as error the trial court's refusal to strike plaintiff's allegation that defendants knew of or ratified the representations of Zimmerman, because there was no evidence that Martin adopted any of Zimmerman's representations as his own. As noted above, there was evidence that Martin did tell plaintiff, as Zimmerman had, that Pearl Music paid royalties and could duplicate even the most recent sound recordings. The motion to strike was properly denied.

■ Defendants next contend that the trial court erred in denying a motion for mistrial. The motion was prompted by plaintiff's counsel's reference to a matter which the court had already ruled "had no place in this case." It has been repeatedly noted that the decision whether to grant a mistrial lies within the discretion of the trial court, which is in a far better position to

assess whether counsel's conduct was in bad faith and whether it had a significant impact on the proceeding which could not be cured by an appropriate instruction. We will overturn the trial court's decision only for an abuse of discretion. *Rhodes v. Harwood*, 280 Or 399, 571 P2d 492 (1977); *Troutman v. Erlandson*, 279 Or 595, 569 P2d 575 (1977). We find none here.

Finally, defendants argue there was no evidence from which the jury could find that plaintiff's alleged damages were caused by the misrepresentations, as is required in a fraud action. *Peterson v. Auvel, supra.* Plaintiff sought to recover for the net operating loss, the difference in the price paid for the business and its true market value on the date of purchase, his lost wages (*i.e.,* those he could have made at some other job) and the price paid for allegedly worthless inventory.

There was evidence from which the jury could find that the difference between the price plaintiff paid for the distributorship and the market price as testified to by him was a direct result of the falsity of the representations. Plaintiff testified that in his opinion the difference was attributable to the fact "that certain aspects of the program were not up to the standards that I had been led to believe." An award for the difference between the purchase price and the market value on the date of purchase was therefore proper. Similarly, the difference between the purchase price and the market value of inventory was also a proper separate item of damages to the extent it was a result of the misrepresentations.

Plaintiff's lost wages and the net operating loss present a different problem. There was no evidence that the misrepresented matters on which plaintiff relied in any way caused the income of the business to be less or its expenses to be greater during the period plaintiff operated it. There may have been evidence from which the jury could have inferred that plaintiff would not have purchased the business had it not been

[516]

for the representations, and he testified that he did rely on the representations. Such "but for" causation, however, is not sufficient by itself to establish the link between the wrong and the damage claimed. *See Simpson v. Sisters of Charity of Providence*, 284 Or 547, 588 P2d 4 (1978).[3] If it were, a person who had been induced to enter into any business by a fraudulent misrepresentation could recover for any loss he might thereafter suffer in the business, regardless of whether there was any other relationship between the loss and the misrepresentation. For example, a person who bought a restaurant (real property, equipment and goodwill) which was falsely represented to be free from termites could experience a net operating loss because he served bad food and still recover that loss in a fraud action based on the misrepresentation. While there is no sympathy for one who commits fraud, such attenuated causation is not a sufficient basis for holding one responsible to make up every loss that would not have occurred had there been no fraud.

According to Prosser, the great weight of authority is that some more substantial causal connection is required:

"So far as the fact of causation is concerned, any loss which follows upon a transaction into which the misstatement induces the plaintiff to enter may be said to be caused by it; but the same considerations which limit liability in cases of tangible harm have

[3] In most fraud cases prior to *Peterson v. Auvel*, 275 Or 633, 552 P2d 538 (1976), it was stated that plaintiff had to show as an element of his case that his damages were "proximately caused" by the misrepresentation. *E.g.,Rice v. McAlister*, 268 Or 125, 519 P2d 1263 (1974); *Ward Cook, Inc. v. Davenport*, 243 Or 301, 413 P2d 387 (1966); *Conzelmann v. NWP&D Prod. Co.*, 190 Or 332, 225 P2d 757 (1950. There were cases in which the court held that a failure to establish even "but for" causation precluded liability, but there were none which held that "but for" causation was by itself sufficient.

In *Simpson v. Sisters of Charity of Providence*, 284 Or 547, 588 P2d 4 (1978), a negligence action, the court stated that the terms "proximate cause" and "legal cause" were misleading and should no longer be used. Instead, the court adopted a "substantial factor" test of causation. The abandonment of the "proximate cause" terminology should apply to fraud actions as well.

operated here. In general, with only a few exceptions, the courts have restricted recovery to those damages which might foreseeably be expected to follow from the character of the misrepresentation itself. Thus if the plaintiff stores his goods in a warehouse represented to him to be fireproof, and they are destroyed when it burns down, he can recover; and likewise where he invests in an automobile agency after false assurances of profits made by similar agencies, and goes bankrupt. But if false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline of the market, or insolvency of the corporation, brought about by business conditions or other factors in no way related to the representations, will not afford any basis for recovery. It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered. Sometimes this has been expressed by saying that the representation in such a case is 'immaterial' to the result; but the conclusion is reached even though the plaintiff has in fact relied, and justifiably so, upon what he has been told." Prosser, Law of Torts, 732 § 110 (4th ed 1971). (Footnotes omitted.)

That is a sound requirement, and we adopt it. Plaintiff presented no evidence of the actual cause of the operating loss. He claims only that he would not have purchased the business had he known the true facts. That was not sufficient. Similarly, plaintiff's claim for lost wages was not supported by sufficient evidence of causation.

Under the pleadings and evidence, the jury could not possibly have based its compensatory award solely upon the difference in the prices and the market values of the business and inventory. The record is not so clear with respect to those legitimate damage items that we could reduce the judgment to a proper amount. The matter must therefore be remanded for retrial, but only on the issues of damages, including punitive damages. *See Weiss v. Northwest Accept. Corp.*, 274 Or 343, 546 P2d 1065 (1976).

Reversed and remanded.